Richmond

WATSON HENRY COMPTON

V.

COMMONWEALTH OF VIRGINIA

January 12, 1979.

Record No. 780485.

Present: All the Justices.

*Franklin M. Slayton* for appellant.

*Thomas D. Bagwell, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

HARRISON, J., delivered the opinion of the Court.

Watson Henry Compton was convicted by a jury of murder of the second degree and was sentenced by the court to confinement in the penitentiary for a period of 15 years. The victim was Hattie C. Ratliff, defendant's alleged fianceê. Defendant has appealed, assigning numerous errors.

At the time of the homicide Compton was 45 years old and was employed as the Compliance Fieldman for the Agricultural Stabilization and Conservation Service in Pittsylvania County. The defendant had been recently divorced from his wife. Mrs. Ratliff, a small woman, five-feet-three-inches tall and weighing approximately 135 pounds, had two children by her divorced husband. Compton testified that he and the victim had planned to be married in February, 1977. Mrs. Ratliff, a frequent visitor who kept clothing and other personal items at Compton's mobile home, spent the night of January 28, 1977, with defendant in his trailer.[1]

On Saturday, January 29, 1977, Compton and Mrs. Ratliff spent most of the day together. They visited her father in a hospital in the afternoon and returned to the mobile home about 6 p.m. After returning, the parties made numerous telephone calls, including one from Mrs. Ratliff to her son. She also called Robert Clark, Mayor of Danville, and she and defendant discussed with the Mayor the effect of the oil shortage on the trailer court occupants. Compton called a Mr. Weatherford regarding the fuel shortage and also had three separate telephone conservations with his former wife, Nancy Compton, regarding the status of their divorce. Compton said that during his first conversation with her, Mrs. Ratliff "cut the phone off"; that Mrs. Compton returned the call and they were again disconnected for some unknown reason; and that this prompted a third call to Compton by his former wife. He said that these calls, together with Mrs. Ratliff's mistaken belief that the Weatherford conversation was with Mrs. Compton, incensed Mrs. Ratliff to the point that she became so upset and

---

[1] The lot on which the trailer was located was leased jointly on August 1, 1976, by the defendant and the victim, who signed her name to the lease as "Hattie C. Compton".

irrational that she said "if that bitch calls you back anymore, I'll kill her", and later "if you are talking to that bitch again I'll go down there and shoot her, kill her". The defendant attributed the victim's behavior to the fact that she had been drinking earlier in the evening, as well as taking prescription drugs, valium and darvocet, for her arthritic condition. He said the combination of drugs and liquor caused her to become upset and unsteady on her feet.[2]

Defendant testified that he was afraid that Mrs. Ratliff would leave the trailer with a handgun that she sometimes carried for protection. He checked and found that the gun was not in its usual position on a nail in a closet. He asked her where the gun was and Mrs. Ratliff said she did not know. Compton said that he thought she may have had the gun in her pocket, and that he was apprehensive because on a previous occasion, when the victim had become upset, she had gone to the home of his former wife to, in her words, "see what a good bitch you left".[3]

Defendant said that he again asked Mrs. Ratliff about her gun and that she still denied having it or knowing where it was. He said at that time he noticed his shotgun sitting in the closet and "decided I had better get the gun and check it and put it back in the back closet with the other gun [referring to a .22 rifle owned by Compton]". He said that he took the gun, sat down at the table across from Mrs. Ratliff and "set the gun on my knee and pulled the slide back on it pointing over to the corner of the kitchen away from her". Then, he said "a shell came up and I saw the gun was loaded". He further said: "When I first ejected the shell out of it I went for the safe guard. I was looking down at the gun and everything happened at one time. The table — she started getting up time the shell came out. The table came towards me, or the chair hit the wall behind me there. I heard that scraping of the chair and she was, I glanced at her out of the corner of my eye and she was up on the edge of the table getting up leaning over and that's the last time before the gun exploded that I saw her until she

---

[2] Dr. David W. Oxley, the Deputy Chief Medical Examiner for Western Virginia, testified that the autopsy of Mrs. Ratliff showed her blood content was .25% alcohol. He stated that a person with this percentage would be quite intoxicated.

[3] Nancy Compton testified that the visit by Mrs. Ratliff did occur but that she created no disturbance at that time.

was coming away from the refrigerator."

Additionally, Compton said: "She was always a little stumblingly or slow getting up with her arthritis. . . She knocked — she pushed the table around as she came and I was looking down and when the table hit the gun it went off beside my leg." Continuing, the defendant stated: "The gun slipped off my leg — I just grabbed at it — I was looking at the safety[4] and when I was looking down to get the safety is when it went off. I grabbed it. The gun exploded up at whatever angle it was."

The defendant testified that after the "gun exploded" he looked up at the ceiling but "it wasn't no hole there. Hattie was coming in from towards the refrigerator. She was falling forward. She was turned sideways to me I couldn't know if she was shot or whether she had got her feet tangled up. . . And I jumped up to grab her to keep her from falling over in the table. And when I did my hand went up — it was my left hand — and missed her chest and caught her in the face and that's where she was shot at . . . I tried to grab her. I grabbed her with both hands and she still slipped away from me and went on the floor".

After the shooting the defendant telephoned the operator and asked for help; went to the bathroom to wash the blood from his hands; and phoned Mrs. Compton. He told her what had happened and asked that she come to the trailer or call someone. Compton testified that after making the call to his former wife, he "walked to the door and stood and looked a minute and I couldn't stand what I was looking at so I cut the light off, I guess". Defendant locked his trailer and then went to the Airport Sunoco Station, arriving there about 8 p.m.

Eugene Street, the operator of the station, testified that Compton tried to get in touch with his former wife, and that he asked Street to call the sheriff's office. He said the defendant paced the floor, was nervous and made the statement that "he had blowed his girlfriend's head off with a shotgun" but that "he said it was a accident, he said he didn't know the gun was loaded or anything". Street said he asked Compton what he was doing with a gun but the defendant made no comment. According to Street, the defendant said that he and Mrs. Ratliff "were setting there, and he said they

---

[4] The defendant suffered an injury in high school which resulted in the loss of two fingers on his right hand. He testified that this prevented him from handling the safety on a gun in a normal manner and consequently, he hunted with the safety off.

was having a drink, and he said he had the gun laying on the table there, and he said he picked it up, and that he didn't realize it was loaded, and he said that it just went off; it was just a accident".

Alvin M. Talley, a deputy sheriff, saw the defendant at the Airport Sunoco Station about 8:50 p.m. He said that defendant was crying at the time and did not want to talk about the shooting. However, Talley said that at one point Compton did say, "God said [d]on't taketh what you can't giveth back", and that the defendant also said, "Oh God, why did I have to do it" and "Oh why did it have to happen to me".[5] Additionally Compton repeatedly said "It was an accident and I did not mean to kill her".

The homicide was investigated by Deputy Sheriff D. A. Collins and other Pittsylvania County officers. Collins testified that they entered the trailer about 9:30 p.m. on January 29, 1977, and found the victim's body lying partly beneath a table in the dining area of the mobile home. He found a 16-gauge Remington shotgun with its magazine open. Two spent 16-gauge shotgun shells were found in the trailer. Collins observed a hole, which he estimated to be at a 45° angle, in the ceiling of the trailer.[6] Near the hole was an indenture apparently made by a round object. Collins observed blood on the refrigerator and a large spot of brains at the bottom of the refrigerator. He saw blood and brains throughout the dining and kitchen area. Collins noticed that a chair closest to the body was "slid away" from the table and that the chair directly across from the table was also "slid away". Two other chairs were closer to the table. Four to six pellets from the gun were found in the cabinet area near the refrigerator. Two waddings from the spent shotgun shells were also found. Collins noted blood on the back of one chair but none on the seat. Two large spots of blood were found underneath the table near the head of the victim. Collins said that there "was two (2) telephone books, placed under her [Mrs. Ratliff's] head. Her head was lying on them". In the bathroom he found bloodstains on a towel as well as bloodstains on the sink. On the day following the homicide Collins found a loaded, red 16-gauge shotgun shell (which he had not noticed before) partly underneath the refrigerator.

---

[5] Compton testified at trial that he had told Mr. Talley, "why didn't it happen to me".

[6] The defendant said that he remembered only one shot although he admitted seeing the hole in the ceiling before he left the trailer on the night of the shooting.

The Commonwealth established through Cleon C. Mauer, a Forensic Scientist, that the gun used by the defendant was in good operating condition and that its safety was functioning properly. Mauer testified that the two spent shotgun shells had contained number one buck metal pellets and that both were fired by defendant's shotgun. He observed that the powder burns around the hole in the ceiling indicated that the gun, when fired, was approximately three to four feet distant from the ceiling. Mauer estimated the angle of the hole in the ceiling to have been approximately 25° and said that the hole was consistent with one made by a shotgun blast. He said that the other indentation in the ceiling was, in his opinion, made by a shotgun shell component.

Linda Harville, on the night in question, was living in a trailer located 10 feet from the trailer occupied by the defendant. She testified that when she arrived home about 7 p.m. on that evening she heard loud noises and arguing in the Compton trailer. She said this continued for around an hour until about 8 o'clock when Mrs. Ratliff's voice got a little louder. Mrs. Harville said she then heard "a bang noise once"; that her child asked about the noise and she responded that she did not know what it was; that she got up and "turned the TV up a little bit louder, and I was going to my bathroom, and then I heard another bang noise". Mrs. Harville estimated that about two or three seconds elapsed between the first and second "bang". She said that after the two noises from the Compton trailer, "it got quiet, I'd say maybe ten (10) minutes. And then I heard his car crank up, Mr. Watson's, Mr. Compton's car. And I got up and looked out the window, and I looked over towards the trailer, and the lights was off, and that's all".

Dr. David W. Oxley testified that the victim's body revealed "a massive shotgun wound of the head, left side of the frontal portion of the forehead was missing down to the level of the ridge of the nose; left eye was missing. The brain had been . . . was missing from the cranial cavity. The area of entrance was near the midline, just above the root of the nose between the eye . . . There was no powder residue present on the skin around the area of entry, nor were there any individual shot pellet wounds in the skin around the area of entry". He said that the shotgun blast was "from front to back" and its direction "horizontal to very slightly upward". He said that the absence of powder burns and individual pellet holes "would in my estimation place the distance of the shot greater than three (3) feet but less than ten (10) feet", measuring from the barrel of the gun to the victim. He said that the brain was

completely blown from the cranial cavity and that this would have resulted in "extensive splattering of blood and tissue . . . [p]robably upward and backward".

The Commonwealth called T. A. Smith, of the Danville Police Department, as an expert witness. On February 6, 1977, Smith, along with Collins and other representatives of the Pittsylvania Sheriff's Department, investigated the scene of the shooting, taking photographs and measurements. Smith said that they were able to reposition the chairs and table in the trailer because there were bloodless circles on the floor where the legs of the table and chairs rested when the shooting and subsequent blood spatter occurred. Smith said that the legs of the chair and table fit perfectly into the little circles. He testified that a repositioned chair, located in front of the refrigerator, showed a very small amount of blood on its inside back and no blood on the seat. He said that there was a tremendous number of bloodspots on the five-feet tall refrigerator; that at the three-foot level the bloodspots were going at a downward angle; that at the four-foot-three-inch level they were straight away with no angle; and at the four-foot-ten-inch and at the five-foot levels, the drops of blood were angling up instead of down. After giving this testimony Smith was asked the following question: "[B]ased on your experience and your findings here, and plus the testimony earlier in the trial to the effect that the deceased was five feet three; that the gunshot wound occurred about here, sixteen gauge shotgun, exited in the rear; do you have an opinion as to where she was at the time she was struck?" Over the objection of counsel for the defendant, Smith was permitted to give the following answer: "Based on the findings of the blood on the refrigerator, relocating the chair, the blood around the chair and the lack of blood on the seat, the small amount of blood on the back of it and the victim at the time that she was shot would have had to have been setting in that chair."

While Smith testified that from the pattern of blood on the refrigerator the victim "had to have been sitting", he admitted that it was possible that the victim was shot when in the process of either getting up or stumbling forward, or, if she was sitting down in a chair, "leaning forward a little bit or leaning back a little bit . . .". However, Smith insisted that "She definitely couldn't have been standing up" because if she had been standing up, the center of the pattern of blood on the refrigerator would have been at or over its top.

The theory of the defense is that Mrs. Ratliff, who was seated across the table from Compton when he was handling the gun, stumbled against the table as she was getting up from her chair and, in so doing, she knocked the table against the gun, causing it to discharge. Consequently, defendant contends that at the instant she was shot, Mrs. Ratliff was standing in a nearly erect position, and he objected strongly to Smith's testimony which placed the decedent in a sitting or crouching position at the time. Compton assigns as error the court's decision to permit this testimony by Officer Smith. He argues that this expert witness was permitted to state a conclusional opinion which was not only based upon a reconstructed scene of the shooting but which touched on the ulimate fact in issue. We disagree.

The ultimate fact in issue for determination by the jury was whether the shooting of Hattie C. Ratliff was an unlawful or an accidental killing. There were no eyewitnesses. The Commonwealth sought to establish through Dr. Oxley and Officer Smith the approximate positions of the defendant and the victim at the time the fatal shot was fired, and the direction of the pellets after the gun discharged. These were evidentiary facts useful to the jury in deciding the ultimate fact in issue - whether the shooting was accidental. Oxley's testimony revealed that the gun was discharged within a range of three to ten feet, close enough so that the pellets entered the victim's head in a group. Oxley said that the same wound could have been inflicted on the victim whether she was standing, half-standing or sitting, provided the muzzle of the weapon and the victim's head were kept at the same angle. Specifically, he said "if you keep the relationship [between the angle of the muzzle of the weapon and the target] constant, you can rotate at a 360 degree circle and not change the degree of the wound itself".

Officer Smith agreed with Dr. Oxley that the gun was discharged within a range of three to ten feet from the victim because otherwise, "Had the shot spreaded out we wouldn't had the pattern we had." It was clearly established that although there were spots of blood and brains throughout the kitchen area of the trailer, the center of the pattern of blood and brains was about midway of the refrigerator. The substance of Smith's testimony was simply that the five-foot-three-inch tall victim could not have been standing erect or nearly erect at the time of the fatal shot (which entered

her head in a horizontal and upward angle) for "That would have moved the center of the pattern up too high. Almost at the top of the [five-foot] refrigerator, or over the top."

Smith's investigation was made on the scene on February 6, 1977. Between the time of the shooting and the investigation by Smith, Compton's mobile home had been under the control and surveillance of the Pittsylvania County police. Those persons who entered the trailer, including an investigator for the defendant, did so in their official capacities and in the presence of officers. It was testified by Deputy Sheriff Collins that at the time the photographs and measurements were made by Smith, the premises were in substantially the same condition as on the night of the shooting when Collins took numerous photographs which were introduced into evidence. Because of indentations and clear circles on the blood spattered floor, Smith and Collins were able to reposition the table and chairs at the places they were located when the officers arrived after the shooting.

While the defendant argues that the victim was standing or was nearly erect, the testimony he gave is consistent with the testimony of the expert that the victim must have been sitting, crouching or leaning forward. Nowhere in his testimony did Compton claim that at the time the gun was fired he and Mrs. Ratliff were wrestling over the gun, that she was trying to take it away from him, that she was approaching him in a threatening manner or that she was walking around in the trailer. He says that at that time they were sitting down at the table. He says that he realized Mrs. Ratliff was getting up from the table, and he explains what happened thereafter in various ways, but consistently and repeatedly as follows: "She was sitting over there"; "She started getting up time the shell came out"; "She was . . . getting up leaning over"; "I could see her leaning over the table".

The defendant's whole case is that Mrs. Ratliff, because of her drunken or arthritic condition, stumbled or fell against the table when trying to get up from a chair, thereby knocking the table against the gun and causing it to go off. While it was Smith's opinion that when the gun discharged, Mrs. Ratliff was sitting in a chair located between the defendant and the refrigerator, he testified that it was possible the decedent was shot while in the act of either getting up or stumbling forward. In either event, it is clear from the testimony and the exhibits that the victim of the shooting

was positioned between the defendant and the refrigerator when the gun was discharged, irrespective of whether she was sitting, leaning, crouching, half-standing or standing.

For the defendant the crucial happening was the table hitting the gun, not the position of Mrs. Ratliff when she pushed or propelled the table into the gun. Had the jury accepted Compton's explanation of why the gun discharged, it could not have found him guilty of an unlawful killing with malice, express or implied.

In *Venable v. Stockner*, 200 Va. 900, 904-05, 108 S.E.2d 380, 383 (1959), Mr. Chief Justice Eggleston said:

> "It is well settled that expert evidence concerning matters of common knowledge or those as to which the jury is as competent to form an accurate opinion as the witness is inadmissible. Or, to state the principle another way, where the facts and circumstances shown in evidence are such that men of ordinary intelligence are capable of comprehending them, forming an intelligent opinion about them, and drawing their own conclusions therefrom, the opinion of an expert founded upon such facts is inadmissible. *Atlantic Coast Line R. Co. v. Caple's Admx.*, 110 Va. 514, 519, 66 S.E. 855; *Richardson v. Lovvorn*, 199 Va. 688, 693, 101 S.E.2d 511, 514; *Ramsey v. Commonwealth*, 200 Va. 245, 249, 250, 105 S.E.2d 155, 158; *Strawderman v. Commonwealth*, 200 Va. 855, 108 S.E.2d 376, decided at this session; 20 Am. Jur., Evidence, § 781, pp. 651-2."

However, it is equally as well settled that expert opinion and testimony are admissible where "the jury, or the court trying a case without a jury, is confronted with issues which require scientific or specialized knowledge or experience in order to be properly understood, and which cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience gained in the ordinary affairs of life". [Footnote omitted.] 31 Am. Jur.2d *Expert and Opinion Evidence* § 16, p. 511 (1967). *See also Ramsey v. Commonwealth*, 200 Va. 245, 105 S.E.2d 155 (1958).

In the instant case it was important for the Commonwealth to explain the absence of powder burns around the wound, the absence of any of the pellets in the face or body of the victim, the presence of powder burns around the hole in the ceiling, the spatter pattern, the volume of blood on the front of the refrigerator and the lesser amount of blood near the top of or above the refrigerator. These were all matters beyond the scope or knowledge of the average juror and were matters within the peculiar knowledge, science and skill of Dr. Oxley and of Officer Smith. Hence, under the particular circumstances of this case, their expert testimony was admissible.[7] A proper foundation was laid for the admission of Smith's testimony, which concerned physical conditions where the alleged homicide occurred. The weight to be accorded his testimony was a matter for determination by the jury.

We find it unnecessary to address what the Attorney General argues is the contemporary view, *i.e.*, favoring the admission of expert testimony even though it relates to an opinion involving an ultimate fact, because we hold that neither Smith nor Dr. Oxley testified to the ultimate fact in issue.

Defendant says that the court erred in permitting the Commonwealth to introduce evidence of alleged prior threats and assaults by Compton upon Mrs. Ratliff. Mrs. Ella Lucille Wilson, a trailer court neighbor of Compton's, testified that in November, 1976, when Mrs. Ratliff was visiting with her, Compton called, asked for Mrs. Ratliff and told Mrs. Wilson, "Well, tell her [Mrs. Ratliff] she'd better come on home, don't I'm going to come get her with a knife." She said that Mrs. Ratliff did not go home and soon the defendant came over and asked her if she was ready to go. When Mrs. Ratliff told him no, Mrs. Wilson said the defendant stood up and reached into his pocket. At this point Mrs. Wilson's husband also stood up and told the defendant that he didn't want any trouble. Mrs. Wilson said Compton then said something about Mrs. Ratliff's car and "throwed her car keys across the room where she was setting . . . and then he left".

Compton's version of this episode was that Mrs. Ratliff had been drinking, and he thought it best that she not drive her car. He said

---

[7] No objection was voiced by counsel for the defendant to the testimony of Dr. Oxley. R. G. Holbrook, a private investigator called by the defense, also testified as to the physical conditions in the Compton trailer after the shooting, including the fact that he did not find "an excessive amount" of blood "above the refrigerator".

that Mrs. Ratliff left his trailer and went toward the Wilson's trailer. He said that later he phoned to find out if she was there. He denied that he made any threat or that any mention was made of a knife. Compton testified that Mrs. Ratliff returned to his trailer and, after opening another can of beer, slashed her left wrist with a pen knife. Compton said that he pulled the knife away from her, but Mrs. Ratliff grabbed the blade end. He said he could not break her grip so he hit her to make her release the blade and avoid cutting her palm. He further said that when he did this, Mrs. Ratliff's head hit a towel rack, causing a big bruise on the side of her face as well as a little blood to appear in the corner of her mouth. When Mrs. Ratliff saw her face in the mirror, Compton said she became hysterical and telephoned her sister, Virginia Carter.

He said that Mrs. Carter arrived shortly thereafter. Mrs. Ratliff, unable to locate her car keys, allegedly told him that if she did not get the keys, her sister would shoot him. He said at that time Mrs. Carter "went in her pocket and started partially out with the gun that she had" and then "dropped her hand back in her pocket and walked back towards the bathroom". Defendant said that because Mrs. Carter had a gun, he picked up his gun, which was in the closet. He said he checked it "and it was empty". He said that he held the gun in his hands and told Mrs. Ratliff to check her pocketbook for the car keys. At that point he said Mrs. Carter took his gun and set it in the corner. Mrs. Ratliff then found the keys to her car, at which time he testified that he told them to leave, for he "didn't know what was gonna happen".

Mrs. Carter denied that she had a gun. Her version was that when she arrived at the Compton trailer, her sister's nose and mouth were bloody and the left side of her face was swollen and bruised. Mrs. Carter said her sister complained that Watson had beaten her with his fists, had knocked her down, had stomped her legs, had hit her in the back of the head with a "water pick" and would not give her the car keys. She also said that defendant, after listening to Mrs. Ratliff's complaint, said, "Yes, I am a sorry son-of-a-bitch." Mrs. Carter testified that when she asked for the car keys again, the defendant went to a closet, took out a gun, "and he put it between my eyes, and he said he would give us a few minutes to get out of there, and he told me he would blow my head off too". She said she was certain that the gun was loaded because when the defendant pulled the lever back, she could see the bullets in it. Mrs. Carter said the defendant then threw some keys on the table, at which point the two women left.

Exceptions to the general rule as to the admissibility of prior offenses have been recognized in a large number of cases in Virginia and summarized by this Court in *Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970), as follows:

> "However, the exceptions to the general rule are equally as well established. Evidence of other offenses is admitted if it shows the conduct and feelings of the accused toward his victim, if it establishes their prior relations, or if it tends to prove any relevant element of the offense charged. Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial."

During the trial the defendant referred to the affection which he and the deceased had for each other, their harmonious relationship, and their plans to marry and to build a home when his divorce became final. Love notes and a sentimental greeting card from the victim to the defendant were introduced by him to show their prior relationship and to negate any reason or motive that the defendant would have had to kill the deceased. This evidence was properly admitted as bearing upon the motive and intent of the defendant, and in support of his theory that the killing was accidental. For the same reason it was equally permissible for the Commonwealth to show that the relationship between the parties was not aways an affectionate and calm one, but that there were turbulent episodes in which the conduct of the defendant toward the deceased was aggressive and threatening.

■ Defendant's assignment of error that a section of the ceiling from defendant's trailer was improperly introduced into evidence is without merit. It was shown that the piece of ceiling was in substantially the same condition at trial that it was in immediately following the shooting. That was all that was necessary. *See Smith* v. *Commonwealth*, 219 Va. 455, 248 S.E.2d 805 (1978).

A section of ceiling is not the type of evidence that lends itself readily to alteration.[8] This evidence was relevant to show that the defendant fired two blasts from his shotgun on the night in question and that the pellets from one blast penetrated the ceiling at an angle estimated to have been between 25° to 45°. Neither fact was in serious controversy.

■ An instruction granted by the trial court that malice is presumed from the use of a deadly weapon, and which the defendant claims was erroneously given, has been approved in numerous Virginia cases. *See Sanderson* v. *Commonwealth*, 200 Va. 51, 103 S.E.2d 800 (1958); *Lloyd* v. *Commonwealth*, 185 Va. 674, 40 S.E.2d 258 (1946); *Adams* v. *Commonwealth*, 163 Va. 1053, 178 S.E. 29 (1935). The defendant relies upon *Lawhorne* v. *Commonwealth*, 213 Va. 608, 194 S.E.2d 747 (1973), but in that case there was no evidence that the use of a pistol was deliberate and not accidental. In the case at bar there is evidence from which the jury could have found that the defendant's use of the shotgun was deliberate.

The parties involved, although engaged to be married, at times had a tempestuous relationship. The shooting was preceded by at least two episodes in which the defendant had displayed anger and ill will toward the decedent. The killing followed a heated argument between the victim and defendant that reached such a pitch that it was heard by a neighbor. Two shots were fired with no satisfactory explanation as to the interval of time in between. The actions and statements of the defendant immediately following the homicide were such that the jury could have found them inconsistent with an accidental shooting.

Furthermore, defendant's claim that the gun accidentally discharged was inconsistent with testimony that the gun was tested and found in good mechanical order with its safety in proper condition. Also, defendant's recourse to a firearm display to resolve a previous controversy with Mrs. Carter and the victim is significant because it was action which, to a degree, paralleled his

---

[8] The only alteration of the ceiling before its removal appears to have been done by defendant's witness, R. G. Holbrook, who said that he took a pen knife and dug out the cap of a shotgun shell from the smaller impression near the hole. Holbrook said he did not "have any doubts what this big hole was caused by, but I was trying to determine what caused this smaller impression".

action on the night of the shooting.[9]

Finally, the necessity for the possession of the gun and the manner of its use were never satisfactorily explained. Defendant claims that he was prompted to possess himself with a loaded shotgun in a scene where the victim, whom he suspected was armed, had been drinking, had become incensed by prior telephone conversations between the defendant and his former wife and had been threatening to kill his former wife. At trial he said "I was afraid that I couldn't control Hattie". When asked if he would have let Mrs. Ratliff leave his trailer that night with a gun, he responded, "Well, if I could have stopped her I would have. If I couldn't have stopped her I don't know what choice I would have had."

■ Whether the shooting of Mrs. Ratliff by defendant, under the circumstances related, was an unlawful or an accidental killing was a matter peculiarly within the province of a jury to determine. The trial of the defendant was had before a jury. It heard the testimony of the witnesses and it, as well as the trial judge, had an opportunity to observe the manner and demeanor of the witnesses and to determine the weight and credibility to be accorded their testimony. The jury was fully and fairly instructed. Its verdict has the approval of the trial court. We cannot say from the record before us that the verdict is contrary to the law and evidence, is without evidence to support it, or is plainly wrong. It is therefore

*Affirmed.*

COMPTON, J., dissenting in part.

---

[9] The defendant also admitted another confrontation with Mrs. Ratliff during which both parties resorted to a display of guns. With reference to that occasion, Compton testified:

"Hattie had gone to see her children or something that night, been down on Riverside. It was early in the afternoon and she couldn't get to see the kids for some reason or other and she was back in the trailer. She was standing in the door with the other rifle I had. She fired it over my head as I came into the door. And backed back into the trailer. And I asked her what was wrong with her. She said, 'well you can't be gone when I'm not here'. She had been drinking some. And I took the gun out of the closet and I said, 'well, anybody can fire a gun. Put the gun away'. She still had the rifle in her hand still inside the trailer and I walked out the door and shot that gun up in the air."

The factual question concerning the victim's exact position at the time of the shooting, that is, her location in the room and whether she was sitting, crouching or standing, was aptly described by the prosecutor as "the very heart of the case" and a "key factor" in the case. The witness Smith, supervisor of the Danville Police Department's "Mobile Crime Lab", was permitted to give his opinion that when shot the deceased was sitting in a particular chair at a specific location in the room. This theory was based on Smith's examination of the crime scene eight days after the shooting. In my opinion, the trial court committed prejudicial error in admitting this testimony over defendant's objection.

In the first place, the conditions at the scene as reconstructed by Smith were not substantially similar to the conditions existing at the time of the shooting. *See Richards* v. *Commonwealth,* 107 Va. 881, 893, 59 S.E. 1104, 1108 (1908). In the second place, under the facts and circumstances of this case, the jury was as competent to form an opinion on that subject as the witness. Hence, I believe the trial judge permitted this witness to invade the province of the jury.

In its attempt to discredit the defendant's testimony, the Commonwealth sought to relate certain blood patterns found at various levels on the refrigerator with the victim's position and the angle of the gun at the moment of the shooting. Thus, it became important in dealing with these variables for the prosecutor to show by the evidence the exact position of the table and a chair in which he claimed the deceased was sitting at the time. Smith said that when he went to the scene more than a week after the shooting he repositioned a chair and the table to locations where he thought they were on the day in question. This was accomplished by placing that furniture in clear spots on the floor appearing in the midst of blood stains. But an examination of one set of close-up photographs showing the floor, taken by a deputy sheriff within two hours of the event, and of another set taken by Smith after he repositioned the chair fails to reveal an amount of blood on the floor in the immediate area of the chair sufficient to make the definitive marks that Smith says he used to reset the scene. Moreover, the photographs taken immediately after the shooting before the body had been removed, which apparently were not used by Smith in his reconstruction, show the chair in a different position from where Smith later placed it. Furthermore, Smith's reconstruction failed to take into account that the chair may have been moved during the period after the gun discharged

and before the police first arrived at the scene. The photographs show the body of the victim lying directly under the table with the lower portion of the corpse adjacent to one of the several chairs near the table. It is entirely likely, therefore, that the victim moved the chair as she was falling after the shot and before blood accumulated on the floor or that the defendant moved the chair as he was attempting to administer to the victim after the shotgun blast. In either case, even the photographs taken immediately after the event would not disclose the exact location of all the furniture at the time of the shot which killed the victim.

But even if it is assumed that Smith's reconstruction of the scene was accurate, the inference to be drawn from all the facts relating to the position of the victim at the moment she was killed was solely within the province of the jury. One of the cases cited by the majority is direct authority for the position I take on this question.

In *Venable* v. *Stockner*, 200 Va. 900, 108 S.E.2d 380 (1959), this court held that the trial judge had committed reversible error in allowing a "safety engineer, accident analyst" to reconstruct the scene of a motor vehicle collision and to state the position of the vehicles with reference to the center of the highway at the moment of a head-on collision. As the majority has pointed out, we said in *Stockner* that "where the facts and circumstances shown in evidence are such that men of ordinary intelligence are capable of comprehending them, forming an intelligent opinion about them, and drawing their own conclusions therefrom, the opinion of an expert founded upon such facts is inadmissible." 200 Va. at 904, 108 S.E.2d at 383. The *Stockner* court said that while a witness may describe tire marks, skid marks, or cuts which he observed on the road at or near the place of an automobile accident, the inferences to be drawn from such testimony are peculiarly within the province of the jury. 200 Va. at 905, 108 S.E.2d at 383.

Likewise in this case, I believe that if a proper foundation is laid, the expert witness could properly testify as to the location of furniture at the scene, the usual pattern formed when blood is impelled by the force of a shotgun blast, the flow of spattered blood up or down the side of a refrigerator, and the time it takes blood to coagulate. But I do not believe that given these facts it is proper to allow the expert to give his opinion on the position of the victim when shot. The subject of such an inference is not so distinctly related to some science, profession, business or occupation as to be beyond the perception of the average layman. C.

McCormick, *Law of Evidence* § 13 (2d ed. E. Cleary 1972); *see* *Grasty* v. *Tanner*, 206 Va. 723, 725-27, 146 S.E.2d 252, 253-55 (1966).

For these reasons, I would reverse this conviction and remand the case for a new trial.

I'ANSON, C. J., joins in this dissent.