# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Friedman, Frucci and Senior Judge Humphreys
Argued at Fredericksburg, Virginia


GLENNARD KENNY MCFADDEN

                                                MEMORANDUM OPINION[*] BY
v.        Record No. 0900-23-4                  JUDGE STEVEN C. FRUCCI
                                                AUGUST 6, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Petula C. Metzler, Judge

Danielle Brown (Danielle S. Brown Law, PLLC, on brief), for
appellant.

Kimberly A. Hackbarth, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Glennard Kenny McFadden was convicted in a jury trial of the 2016 aggravated malicious

wounding of his then-girlfriend, Marilyn Wiley, and of the 2018 domestic assault and battery of

Wiley.  On appeal, McFadden challenges the introduction of certain uncharged "bad acts" evidence

and the circuit court's failure to sever the two charges.  McFadden also contests the sufficiency of

the evidence regarding whether Wiley suffered permanent and significant impairment from the

malicious wounding and the circuit court's imposition of a sentence above the discretionary

sentencing guidelines.  Finding that McFadden has procedurally defaulted on one claim and that the

circuit court otherwise did not commit error, we affirm.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

# I. BACKGROUND[1]

McFadden and Wiley began a romantic relationship when she was 17 years old. The romantic relationship lasted for seven years, ending on March 18, 2018. During that time, they had two children but never married. On August 14, 2016, Wiley was in the kitchen of the two's townhouse while McFadden was yelling at her from the family room "about everything" and threatening to leave her. After Wiley responded to him with "the door is right where it's always been," McFadden came into the kitchen and threw a ceramic bowl at her. The bowl hit the stove next to her and shattered. In the next few seconds, McFadden grabbed Wiley, put her above his head, and then "thr[ew her] on the ground, and . . . wouldn't stop. He just kept going." After Wiley's head began to bleed, McFadden "rocked her back and forth and screamed 'Why do you keep making me do this to you?'" McFadden called 911 and then "came up with a story about what [they] were going to say when emergency services arrived." Wiley then went to an upstairs bathtub to wash the blood off her.

Manassas Park Police Officer Walker was dispatched to McFadden's home shortly after the incident to investigate what was initially described as "a domestic assault and battery." Fire and rescue personnel were already there when Officer Walker arrived. Officer Walker went upstairs where he came upon Wiley, who was standing in the bathtub and trying to dress. Officer Walker saw a large gash above her left eye, which he regarded as "significant." After helping Wiley out of the bathtub, Officer Walker noticed a second gash to the back of her head. Officer Walker determined that Wiley needed urgent medical care.

---

[1] On appeal, we view the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the [circuit] court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Wiley told Officer Walker, first in the ambulance and later at the hospital, that she had been standing on the kitchen counter cleaning cabinets when she fell. Wiley also told Officer Walker that she threw the ceramic bowl at McFadden causing it to shatter. Later when Wiley testified at trial, she explained that she did not tell others what actually had happened to her because she feared for her life and wanted to keep her family together.

Officer Walker quickly became suspicious about the initially claimed accident, both because of the extent of Wiley's injuries and his observations at the scene. Among other things, the shattered bowl was "covered in blood" and a dustpan appeared to have been used to sweep up the shards. Officer Walker also saw no evidence that Wiley had been standing on the kitchen counter or that she had been using any cleaning supplies. Further, Officer Walker saw blood "throughout the entire kitchen," which was not consistent with bleeding from a fall.

Because the story "did not make sense to [Officer Walker] based on [his] training and experience," he concluded that "further investigation" was needed. Therefore, Officer Walker went to the hospital and spoke with Wiley "to get a better look, get an opportunity to interview her away from the scene." Officer Walker also took several pictures of Wiley's injuries. Officer Walker then returned to the townhouse, took pictures of the kitchen, and prepared a report of the incident.

Come early March of 2018, Wiley was living with her mother in Manassas. At that time, she and McFadden were facing eviction from their home. Late in the evening of March 16, 2018, Wiley returned home from work and went to bed "exhausted." In the early morning hours of March 17, Wiley had "probably sixty missed calls" from McFadden when she then answered his phone call. McFadden told Wiley he was on the way to her home and accused her of cheating on him when she failed to return his calls. Sometime between 3:00 a.m. and 4:00 a.m., McFadden arrived at the house and Wiley came out to meet him on the front porch. At trial, the

Commonwealth introduced video surveillance footage of the encounter that followed. McFadden grabbed Wiley's phone and began to look through her phone calls. McFadden then went inside the house to the family room, where he stopped behind a couch and "smacked [Wiley] to the ground" with "an open hand." Wiley's ears began "ringing" from the blow. McFadden told Wiley she was being "dramatic and . . . trying to get him in trouble." McFadden continued to examine Wiley's phone and accuse her of cheating on him. McFadden looked through Wiley's phone for about 15 minutes before finally leaving.

During the trial, the Commonwealth also introduced two phone texts from McFadden to Wiley from later March 17, 2018. In one, McFadden said that he "didn't fucking hit u. I pushed you, which was wrong of me, but y'all got what y'all wanted, to get me pissed off." The second text said: "Mushed ur fucking head."

Wiley testified that her relationship with McFadden ended after that incident. Wiley filed for custody of their children on March 18, 2018, and got a protective order against McFadden. Wiley also called Officer Walker regarding the 2016 incident, and the two met at the police department on April 10, 2018. At that time, Wiley told Officer Walker that during the August of 2016 incident, McFadden "came in the room, he threw the bowl, he left, he came back in, he picked me up over his head. He threw me multiple times, then picked me up and rocked me back and forth." Wiley said the injury to her forehead had resulted from McFadden's assault. Wiley received ten stitches to her forehead and ten staples to the back of her head. Wiley told Officer Walker that she had not left McFadden after that incident because "she didn't think it was going to happen again [and] she was scared." Wiley also stated that she had lied to Officer Walker after the 2016 assault because she was afraid McFadden would kill her. Wiley still feared McFadden after that incident. Following, Officer Walker also investigated Wiley's

- 4 -

account of the March of 2018 incident, reviewing her phone records and the video surveillance footage of her conversation on the front porch of her mother's home with McFadden.

Over McFadden's objection, the circuit court granted the Commonwealth's motion *in limine* to permit Wiley to testify to certain bad acts and other uncharged conduct.[2] In her trial testimony, Wiley recounted several other abusive acts by McFadden. One such act occurred in May of 2012 (or about one year after their relationship had begun) when McFadden asked her numerous questions in their bedroom about her prior sexual history "and when he didn't feel like he was getting the answers, . . . he picked [Wiley] up by [her] neck and put [her] against the wall." McFadden then threw Wiley on the bed, put a "twisted up" shirt in her mouth, tied it behind her head, and hit her with a closed fist. Later that day, McFadden stuck Wiley out of a window and "eventually" pulled her back in. Similarly to what would occur in 2016, McFadden began to rock her back and forth and asked, "Why did you make me do this to you?"

Wiley testified about another act of prior abuse which occurred around New Year's Eve of 2013. On that date, Wiley had disregarded McFadden's order to not go outside their home by going out of the home to smoke a cigarette. Wiley had accidentally locked herself out, and McFadden would not let her back in and repeatedly accused her of cheating on him. On the following day, Wiley was in her bedroom when McFadden put a knife to her neck and again accused her of cheating.

The final incident Wiley described occurred in April of 2015. McFadden could not find his money and accused Wiley of stealing it. McFadden threw Wiley on the couch and sat on her chest. After McFadden got up, he picked Wiley up and threw her in the kitchen. Wiley ran out of the back door and screamed, "Help," but no one heard her. At the time of these incidents,

---

[2] The circuit court also granted the Commonwealth's motion *in limine* to permit evidence on a fourth incident in December of 2015, but Wiley did not testify about that date during the trial.

Wiley weighed about 110 pounds and was five feet, one inch tall, while McFadden was about six feet tall.

After the circuit court denied the defense's motion to strike, McFadden testified on his own behalf. Regarding the 2016 incident, McFadden claimed that Wiley had climbed on the kitchen counter many times to clean and was in the kitchen cleaning. McFadden heard a dish shatter three times. On the third occasion, McFadden also heard "a tumble" and went into the kitchen. There, he saw "glass everywhere" and Wiley lying on her back. After Wiley's head began to bleed profusely, McFadden realized her "injury was pretty bad." McFadden called for an ambulance and took her to a bathtub to wash off the blood. McFadden testified that no other incidents occurred before March of 2018.

Regarding the 2018 incident, McFadden stated that on March 12, 2018, Wiley had become "pretty emotional" when their application for a new apartment had been denied. The situation between the two had become "toxic," so they decided they "needed to take a break" and Wiley moved in with her mother. McFadden claimed that on the night of March 16, 2018, he and Wiley had agreed to "rekindle [their] connection" with a "sexual interaction." Because of "a lot of dropped calls," the two were unable to meet as planned and Wiley went to her mother's home. McFadden testified that he arrived at the house around 4:00 a.m. with the intention to take Wiley in an Uber to their old house. After speaking on the front porch with Wiley, McFadden went inside and looked through her phone to examine the call history. McFadden testified that the only physical contact between them occurred when Wiley approached him, apparently intending to kiss or embrace him, at which point he "restrained her and pushed her to the side."

McFadden stated that he was telling the truth. Further, McFadden claimed that Wiley's testimony that he had slapped her in the 2018 incident was "completely false." However,

McFadden acknowledged that he had sent the texts to Wiley that had been introduced by the Commonwealth and that he had admitted that he had pushed her. McFadden stated that he had been "very verbally abusive to Marilyn, [but] never physical."

## II. ANALYSIS

A. *The circuit court did not abuse its discretion in admitting the prior acts of abuse.*

McFadden challenges the admission of Wiley's testimony about his alleged acts of abuse in May of 2012, New Year's Eve of 2013/New Year's Day of 2014, and April of 2015 as duplicative of her testimony describing the nature and history of her relationship with him and as unduly prejudicial. A circuit court's decision to admit or exclude evidence is reviewable as an abuse of discretion. *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021). Likewise, a circuit court has discretion in weighing the probative value of evidence versus its prejudicial effect. *See id.* at 424. "In evaluating whether a [circuit] court abused its discretion, . . . 'we do not substitute our judgment for that of the [circuit] court. Rather, we consider only whether the record fairly supports the [circuit] court's action.'" *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (second alteration in original) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). This Court will find an abuse of discretion only when "reasonable jurists could not differ." *Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019) (quoting *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017)).

The general inadmissibility of prior bad acts evidence, as well as the numerous exceptions to that rule, are both well-established. "As a general rule, evidence of a defendant's prior bad acts or other crimes is inadmissible 'to prove the character trait of a person in order to show that the person acted in conformity therewith.'" *Osman v. Commonwealth*, 76 Va. App. 613, 640 (2023) (quoting Va. R. Evid. 2:404(b)). "However, such evidence may be admissible to prove motive[, opportunity, preparation, plan, knowledge, identity, absence of mistake or

accident,] and intent[, or if they are a part of a common scheme or plan], but *only if* the [circuit] court determines that the 'legitimate probative value of such proof outweighs its incidental prejudice.'" *See id.* (citing *Lambert v. Commonwealth*, 70 Va. App. 740 (2019)); *see also* Va. R. Evid. 2:404(b).

In its motion *in limine*, the Commonwealth argued that Wiley should be permitted to testify about the prior acts of domestic abuse "to show the nature of the relationship between the Defendant and Ms. Wiley, to show Defendant's feelings towards Ms. Wiley, to show Defendant's motive and intent, to show Ms. Wiley's state of mind in 2016 and 2018, and to explain the inconsistent statements." Further, the Commonwealth sought the admission of this evidence "to show a past course of violence by Defendant against Ms. Wiley, . . . Defendant's intent and malice, as well as Defendant's motive to maliciously wound Ms. Wiley." Finally, the Commonwealth argued that such evidence should be admitted to explain Wiley's inconsistent statements and her delay in reporting the abuse.

During the hearing on the motion *in limine*, the circuit court ruled that the Commonwealth would be allowed to introduce evidence of the prior domestic abuse but directed that a cautionary instruction should be given as to each prior act of abuse making clear that it was offered only to show "the relationship between the parties, either the issue of intent or malice and for motivation." The circuit court took under advisement the Commonwealth's additional argument that the evidence was admissible to explain why Wiley had not reported the 2016 attack until 2018. At trial, Wiley testified to the acts of abuse in May of 2012, New Year's Eve of 2013/New Year's Day of 2014, and April of 2015. Following, a cautionary instruction was given to the jury regarding each of the prior incidents, stating the jury could consider each of the three dates of physical abuse Wiley had described in her testimony

> only as evidence of the defendant's motive, opportunity, intent,
> preparation, plan, knowledge, identity, absence of mistake or

accident, his conduct and feelings toward the victim and the relationship between them, or if the evidence is connected with or leads up to the offenses for which the defendant is on trial, and for no other purpose.

Settled precedent provides that

[e]vidence of prior bad acts, including domestic violence, is . . . admissible "when it 'shows the conduct or attitude of the accused toward his victim[,] establishes the relationship between the parties,'" or "is connected with or leads up to the offense for which the accused is on trial," so long as the probative value outweighs any prejudicial effect.

*Osman*, 76 Va. App. at 640 (third alteration in original) (quoting *Conley v. Commonwealth*, 74 Va. App. 658, 670-71 (2022)). The bad acts evidence in question was probative for the 2016 and 2018 incidents, as it tended to shed light on the nature of McFadden's and Wiley's relationship, McFadden's attitude towards Wiley, and explain actions taken by McFadden and Wiley during the incidents.[3] *See generally Osman*, 76 Va. App. 613 (upholding introduction of various acts of physical and verbal abuse in 2016 and 2017 in the defendant's 2018 prosecution for felony abduction, misdemeanor domestic assault of a family member, and violations of a protective order as the "probative value to prove motive and intent and also a prior relationship in [that] particular case and that outweighs any prejudicial effect"); *Kenner*, 299 Va. at 427 (upholding admission of other crimes evidence that "was relevant to show Kenner's conduct or attitude

---

[3] Notably, the oldest prior incident of abuse Wiley testified about occurred in May of 2012, approximately four years and three months prior to the 2016 incident. However, the additional evidence of prior acts of domestic abuse in dispute occurred in 2013/2014 and in 2015, showing a continuing series of abuse allegations between Wiley and McFadden from 2012 to 2018. While remoteness of prior acts can affect its probative value, it does not in itself render such evidence incompetent. *See, e.g.*, *Ortiz v. Commonwealth*, 276 Va. 705 (2008) (discussing evidence of prior acts of intercourse in the prosecution of incest cases). As such, while the remoteness of a prior act may lessen the probative value, it is ultimately a consideration to be taken when conducting the balancing test between probative value and prejudice effect. Therefore, this Court will "not substitute [its] judgement for that of the [circuit] court" and shall only consider "whether the record fairly supports the [circuit] court's action." *Carter*, 293 Va. at 543.

towards the victim, motive, method and intent"); *Morse v. Commonwealth*, 17 Va. App. 627, 632 (1994) (upholding admission of other crimes evidence because "the prior relations of the couple showed the victim's state of mind 'as to why she did what she did'" (quoting *Scott v. Commonwealth*, 228 Va. 519, 527 (1984))). As it uniquely shed light to those dynamics, it is also not "duplicative with Wiley's other testimony about the nature of her relationship with McFadden."

Under Code § 18.2-51.2, the Commonwealth had to prove that McFadden maliciously wounded Wiley with the intent to maim, disfigure, disable, or kill. McFadden's claims that he harbored no such intent and Wiley's injuries were accidental were of no consequence. "The Commonwealth cannot have its evidence barred or 'sanitized' simply because the defendant takes the position that the offense did not occur and therefore intent is not genuinely in dispute." *Kenner*, 299 Va. at 426. Thus, where the Commonwealth's evidence "was relevant to show the defendant's attitude and conduct toward the victim, to prove motive or method of committing the [offense] and served to prove elements of the offense," the circuit court does not abuse its discretion by admitting such evidence. *Id.* at 427. *See also Compton v. Commonwealth*, 219 Va. 716, 729 (1979) (upholding admission of prior acts of abuse by the defendant as probative of his motive and intent, as well as his prior relationship with the victim); *Gibson v. Commonwealth*, 216 Va. 412, 415-16 (1975); *Kelly v. Commonwealth*, 8 Va. App. 359, 369-71 (1989); *Callahan v. Commonwealth*, 8 Va. App. 135, 141-42 (1989).

Significantly, the circuit court specifically instructed the jury that it could consider each of the three dates of physical abuse Wiley had described in her testimony

> only as evidence of the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, his conduct and feelings toward the victim and the relationship between them, or if the evidence is connected with or leads up to the offenses for which the defendant is on trial, and for no other purpose.

Therefore, the circuit court took action to mitigate the prejudicial effect of the evidence. *See Osman*, 76 Va. App. at 641; *Brooks v. Commonwealth*, 73 Va. App. 133, 148 (2021) (stating "[t]he danger of unfair prejudice can also be mitigated by an instruction to the jury that limits their consideration of other crimes evidence to its proper purposes and application to each offense charged"); *Teleguz v. Commonwealth*, 273 Va. 458, 480-81 (2007) (stating that the jury is presumed to follow cautionary instructions). As such, since the record fairly supports the circuit court's actions, this Court does not find that it abused its discretion in admitting the prior acts of abuse.

### B. *McFadden's challenge to the unitary jury trial is defaulted.*

McFadden asserts that the circuit court abused its discretion in allowing the two charges to be tried together. The Court need not decide this issue, because the record demonstrates that McFadden never requested that the charges be severed. Thus, Rule 5A:18 bars review of this claim.

Nothing in the record indicates that McFadden ever requested separate trials or objected to a unitary trial. The same grand jury indicted him on the two offenses, and they were docketed for a single trial. While McFadden claims that he raised the severance issue in his pretrial response to the Commonwealth's motion *in limine* and during argument on that motion, all the pretrial pleadings and the argument addressed the admissibility of the bad acts evidence discussed above and not whether the charges should be tried separately. Indeed, both in the circuit court and on appeal McFadden has referred to the "prior, uncharged, alleged criminal conduct" as the crux of the motion *in limine*. Whether uncharged bad acts evidence is admissible is a discrete issue from whether the charged crimes should be tried separately or together. Raising only the first issue in the circuit court is insufficient to preserve the second. "Procedural-default principles require that the argument asserted on appeal be the same as the

contemporaneous argument at trial." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019); *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc) (stating "[m]aking one specific argument on an issue does not preserve a separate legal point on the same issue for review"). "The purpose of th[e] contemporaneous objection requirement is to allow the [circuit] court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). Virginia circuit court judges are a resilient lot; a specific and timely objection will often result in judicial self-correction by making rulings that protect the litigants from potential error in real time, thereby eliminating even the need for an appeal. *See Brown v. Commonwealth*, 279 Va. 210 (2010). As McFadden failed to timely raise the severance issue before the trial judge, the trial judge was never given the opportunity to consider the issue, let alone make a ruling on it.

McFadden asserts that this Court may review the present claim under the ends of justice exception to Rule 5A:18. This exception, however, "is narrow and is to be used sparingly." *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220 (1997)); *Bazemore v. Commonwealth*, 42 Va. App. 203, 219 (2004) (en banc). It permits review of a defaulted claim only "when the record affirmatively shows that a miscarriage of justice has occurred, not when it merely shows that a miscarriage *might* have occurred." *Mounce v. Commonwealth*, 4 Va. App. 433, 436 (1987). "The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt*, 66 Va. App. at 210 (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 514 (2009)). Because McFadden has not shown that "a grave injustice" would occur if the ends of justice exception is not invoked, this Court does not address the merits of this defaulted claim. *See Howard v. Commonwealth*, 281 Va. 455, 462 (2011).

C.  *A reasonable finder of fact could conclude that Wiley's injury was both permanent and significant.*

McFadden also challenges the sufficiency of the evidence on his aggravated malicious wounding conviction on the ground that the evidence proved only that the injury Wiley suffered in the 2016 assault was permanent and not that it was significant.  McFadden points to the lack of "reports that she lost housing or employment opportunities," as well as the supposed lack of proof that Wiley's "scar had an otherwise significant impact on her life."

"In reviewing a challenge to the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)).  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)).  "In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'"  *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).  "Thus, we will affirm the judgment of the [circuit] court unless that judgment is 'plainly wrong or without evidence to support it.'"  *Id.* (quoting *Kelly*, 41 Va. App. at 257).

"To be convicted of aggravated malicious wounding under Code § 18.2-51.2, the injuries inflicted on the victim must be both a 'significant physical impairment' and 'permanent.'"  *Alston v. Commonwealth*, 77 Va. App. 639, 650 (2023) (quoting *Lamm v. Commonwealth*, 55 Va. App. 637, 644 (2010)) (holding that loss of teeth was a "significant and permanent injury").

- 13 -

A "physical impairment" is "any physical condition, anatomic loss, or cosmetic disfigurement." *Lamm*, 55 Va. App. at 644 (quoting *Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995) (holding that injuries that required ten to twenty stitches and resulted in cosmetic disfigurement constituted "permanent and significant physical impairment")). In this case, Officer Walker testified that when he first saw Wiley at her townhouse in August of 2016 she had "a large gash over her left eye." Officer Walker described the injury he saw thusly: "It was a significant laceration to where it not only went through the layers of skin, but the meaty portion kind of behind that, to her bone. It was significant. I mean it was opened." When Officer Walker spoke with Wiley in April of 2018 he noticed the scar on her face, which was "extremely visible."

Furthermore, Wiley testified that she received ten stitches to her forehead and ten staples to the back of her head after the 2016 incident. Wiley stated that she had "shooting pains going up . . . even for years after [and] headaches." Also, the scar on her face "swells up sometimes" and on occasion she felt "a tingly pain that goes up from it." Wiley further described the continuing emotional impact of the injury on her, stating: "[E]very single day I look in the mirror I have to see what he did to me. Every time a kid calls me a Chucky doll, I have to see what he did to me. Every single time some random person . . . asks me about the scar on my head, I have to figure out how to say something without them being uncomfortable." From these facts and circumstances, a reasonable finder of fact could conclude that Wiley's injury was both permanent and significant.

D. *The sentence the circuit court imposed was not an abuse of discretion.*

Finally, McFadden challenges his sentence as an abuse of discretion. McFadden points to the fact that the circuit court meted out a sentence more than twice the high end of the discretionary sentencing guidelines even though the Commonwealth had sought a sentence only at the high end. McFadden also says that his criminal history was "minimal" and that the court based its sentence on something already factored into the guidelines, i.e., the severity of Wiley's injury.

On appeal, a circuit court's sentence is reviewable for an abuse of discretion. *Minh Duy Du v. Commonwealth*, 292 Va. 555, 563 (2016).

> A [circuit] court abuses its discretion "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; or when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment."

*Murry v. Commonwealth*, 288 Va. 117, 122 (2014). Notably, "the judge closest to the contest is the judge best able to discern where the equities lie." *Minh Duy Du*, 292 Va. at 564 (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). "'[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end.'" *Guest v. Commonwealth*, 78 Va. App. 187, 198 (2023) (alteration in original) (quoting *Minh Duy Du*, 292 Va. at 565).

McFadden does not challenge the fact that his sentence fell within the statutory limits. While the discretionary sentencing guidelines recommended a range from five years and one month to eleven years and three months, with a midpoint of nine years and five months, aggravated malicious wounding is a Class 2 felony punishable by a term of 20 years to life and domestic assault and battery is a Class 1 misdemeanor punishable by a jail sentence of up to 12 months. Code §§ 18.2-10, 18.2-51.2, 18.2-11, 18.2-57.2. The circuit court imposed a sentence of 40 years, with 15 years suspended, on the felony conviction and 12 months in jail, all suspended, on the misdemeanor conviction. McFadden does not contend that the trial judge failed to consider any of his evidence or that the trial judge relied on some impermissible factor. Given that the guidelines are wholly discretionary, and the trial judge sentenced within the maximum punishment allowable by statute, we hold that the circuit court properly exercised its broad discretion in sentencing McFadden.

## III.  CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*