# Richmond

HARRY LUCAS RAMSEY v. COMMONWEALTH OF VIRGINIA.

October 13, 1958.

Record No. 4840.

Present, All the Justices.

The opinion states the case.

*Henry Breckinridge Vance* and *Robert C. Smith*, for the plaintiff in error.

*C. F. Hicks, Assistant Attorney General (A. S. Harrison, Jr., Attorney General,* on brief), for the Commonwealth.

SNEAD, J., delivered the opinion of the court.

On July 2, 1957, Harry Lucas Ramsey was found guilty by a jury and sentenced to confinement in the penitentiary for one year on an indictment charging that on February 13, 1957 he did wilfully, maliciously and feloniously set fire to or burn his dwelling house,

with goods and chattels therein, which were insured at the time against loss or damage by fire, with intent to injure the insurer. § 18-158, Code 1950. Ramsey's motion to set aside the verdict was overruled and judgment was entered thereon.

The evidence may be summarized as follows:

Ramsey purchased an old building for $250. With the assistance of his father and neighbors it was dismantled and reconstructed on property, approximately four miles north of Buena Vista on State Highway No. 706, which he had acquired. Additional materials purchased and used in reconstructing the frame dwelling, which consisted of four rooms and rested on unmortared cinder block pillars, amounted to $292.

On January 4, 1957 Ramsey applied to Earl Starkey, an insurance agent in Buena Vista, for fire coverage in the sum of $4,000. After describing the premises Ramsey was informed by Starkey that he could not write insurance in that amount but he "might" write it for $3,000. Whereupon Ramsey stated: "Well, I have over $2,000 in material in this dwelling." Ramsey paid the required premium. The next day Starkey inspected the dwelling and wrote Ramsey advising that $1,000 was the maximum coverage he would be willing to write and refunded the premium paid. Ramsey then contacted another agent in Buena Vista, a Mrs. Paxton, who issued a standard fire insurance policy for $2,500 on the dwelling and $500 on personal property contained therein, effective January 5, 1957. This policy was in force when the dwelling and its contents were destroyed by fire.

Deputy Sheriff Elmo Cooper testified that a two and one-half ton International truck with the rear portion resting on cinder blocks had been parked with the front end facing east or toward the dwelling and approximately 15 feet from it for several months prior to the fire, and that sometime between the afternoon preceding the day of the fire and the next morning the position of the truck had been reversed so that the front end of the truck faced west or away from the house. Robert Hall, who assisted Ramsey in moving the truck, stated the land sloped and the change was made to place the rear end of the truck higher than the front end in order to prevent grease from running out of the rear end.

At about 6:45 P. M. on February 13, 1957, Ramsey and his family left their home and drove to East Lexington Church which is a distance of six and one-half miles. There was a fire burning in a

stove at the time of departure. Upon arrival Ramsey parked his vehicle and his family entered the church. He walked to East Lexington Grocery Store which is near the church. While there he called Pete's Taxi at 7:25 P. M. and inquired as to the round trip fare to Mountain View School which is near his residence. A taxi cab operated by Robert E. Fox soon thereafter picked up accused and drove him to the vicinity of his home. Ramsey told Fox he wanted to be back at the church by 7:55 P. M. so that no one at the church would realize that he was gone. He also stated to Fox: "I have a deal cooked up but I don't have to tell you what it is."

Ramsey left the taxi cab in the vicinity of Mountain View Church, at a point about 75 yards from his home and he headed in that direction. The evidence is silent as to whether or not he entered his dwelling. Fox proceeded a short distance in order to turn his vehicle around. After a lapse of between two and three minutes Ramsey re-entered the taxi cab about where he left it at approximately 7:45 P. M., arrived at East Lexington Church at about 7:55 P. M. and took a seat in the church where he remained until he was notified around 9:45 P. M. that his dwelling was on fire. Fox stated that it was a cold dark night; that he did not observe any lights in the direction of Ramsey's dwelling; that Ramsey was not indulging in intoxicants; that he did not smell the odor of kerosene or gasoline about him; that he showed no signs of exertion or of excitment, and that Ramsey just wanted to "go and come."

The fire was first seen by neighbors at 9:30 P. M. Flames were coming out from under the eaves, but the walls were standing. Responding to a call, the Buena Vista fire department arrived at the scene about 9:50 P. M. at which time the building was completely destroyed.

Several days after the fire, Ramsey contacted Fox, the cab driver, and requested Fox not to mention to members of his church that he had driven him down to the vicinity of his home on the evening of the fire, for it would put him in a bad light with them.

The size of the dwelling was approximately 18 feet across the front and 24 feet deep. It had a metal roof and a unlined cinder block chimney near the center which fell during the fire. Between 30 and 40 feet from a corner of the house there was a power line pole. On it was a small transformer and a power line connected which led toward the destroyed dwelling house. It was touching the

ground short of where the residence formerly stood. There was no authorized electrical service going into the house.

Included among the articles found in the debris were a cast iron cook stove, a cast iron heater, evidence of electrical appliances, a gasoline power saw, several small metal cans and a five gallon can, bits of wire similar to extension cord wire, a small clamp identified as the type used to make electrical connections, and an old model fuse box.

Several witnesses testified in behalf of the accused, but he elected not to take the stand.

In addition to challenging the sufficiency of the evidence to support a conviction, Ramsey contends the lower court erred in permitting the Commonwealth to propound a hypothetical question to Augustus S. Hydrick, Special Agent for National Board of Fire Underwriters.

The hypothetical question follows:

"Assuming that a person is occupying a dwelling as described in the evidence in this case, assuming that there is no direct evidence of exterior wiring into the dwelling and no meter or fuse box connected to wiring from the transformer to the dwelling, assuming further that on Tuesday, February 12, 1957, a 2½ ton truck of the occupant was parked close to the dwelling with the cab of the truck facing the dwelling and on Wednesday February 13, 1957, the truck was turned around and moved so that it was approximately 30 feet away from the dwelling with the cab facing away from the dwelling, assuming further that the occupant had invested less than $600.00 in material in the dwelling when he applied for a $4,000.00 fire insurance policy thereon and represented to the fire insurance agent that he had over $2,000.00 in material invested therein, assuming further that the occupant of the dwelling left it unoccupied on the 13th day of February, 1957, with a small fire in the heater located in the front room being the only fire in the dwelling at or approximately 6:30 P. M., assuming further that the occupant returned by taxi to the dwelling at or approximately 7:45 P. M., assuming further that the occupant made no complaint or report of any unusual fire when leaving the dwelling by the same taxi at or about 7:50 P. M., assuming further there is no evidence of exterior fires adjoining the building, assuming further there was no physical evidence in the debris of any *any* objects calculated to produce spontaneous combustion, assuming further there was no direct evidence

of defective heaters or flues in the dwelling, assuming further that the occupant when returning to the dwelling from church by the same taxi between 7:30 and 8 o'clock P. M. advised the taxi driver if he got back to church before 8 o'clock no one would know he had gone, assuming further that the occupant several days after the fire sought out and told the taxi driver if anyone questioned him about the trip to forget it and deny taking him, assuming further that the dwelling was completely destroyed by fire originating sometime between 9 and 9:30 P. M. on February 13, 1957, based on the assumptions in this hypothetical question and on your knowledge and experience as a Special Agent for the National Board of Fire Underwriters do you have an opinion as to the origin of such a fire, and if so, please state your opinion to the Court and jury?"

Over the objection of accused, Hydrick was permitted to answer the question. After a very lengthy response in which he stated his reasons for the opinion reached, he concluded by saying:

"Considering the accidental causes, which we felt were eliminated as the cause of this fire, coupled with our experience and the unusual circumstances that transpired shortly prior to this fire, several days before, the night of the fire and two or three days after the fire, and when all matters were considered together I reached the conclusion that we had an incendiary fire."

Ramsey argues that the question and answer were improper and constituted prejudicial error because the province of the jury was invaded as to the ultimate facts in issue. He maintains it was for the jury to decide whether or not the fire was of incendiary origin along with who was the guilty agent, and not for an expert witness to determine.

In *Southern Railway Co.* v. *Mauzy*, 98 Va. 692, 694, 37 S. E. 285, the admissibility of opinions of witnesses was discussed. There we said:

"* * * No principle of law is better settled than that the opinions of witnesses are in general inadmissible, that witnesses can testify to facts only, and not to opinions or conclusions based upon the facts. *Hanriot* v. *Sherwood*, 82 Va. 1; *Hammond* v. *Wood*, [Woodman] 41 Me. 177 (66 Amer. Dec. 219). To this general rule there are exceptions. The case at bar, however, does not come within their influence. In the valuable note to the case last cited (66 Amer. Dec. 228), it is said, with abundant authority in its support, that 'the competency of expert testimony in a particular case depends

upon the question as to whether or not any peculiar knowledge, science, skill or art, not possessed by ordinary persons, is necessary to the determination of the matter at issue; * * * * that expert testimony is not admissible as to matters within the experience or knowledge of persons of ordinary information, as to which the jury are competent to draw their own inferences from the facts given in evidence before them, without extraneous aid other than the instruction of the court upon questions of law.' " See also 20 Am. Jur., Evidence, § 781 p. 651.

In 20 Am. Jur., Evidence, § 782, pp. 653, 654, it is stated:

"In many cases it is asserted as a broad general rule, often assumed to be an inflexible rule of law, that while an expert may be permitted to express his opinion, or even his belief, he cannot give his opinion upon the precise or ultimate fact in issue before the jury, which must be determined by them. In other words, while a jury is entitled to the aid of experts in determining the existence or non-existence of facts not within common knowledge, an expert witness must not take the place of the jury and declare his belief as to an ultimate fact. * * *"

It is said in Wharton's Criminal Evidence, 11th Ed. Vol. 2, § 956, pp. 1680, 1681:

"* * * In an arson case, a witness cannot, as a general rule, testify concerning his opinion as to whether the fire was or was not of incendiary origin, that being a question for the jury to determine, and upon which they can usually form their own opinion without any need of expert advice. However, exceptional cases may arise which would justify the admission of expert opinion testimony on such a question as an aid to the jury in arriving at their determination. * * *"

Another expression of the rule is stated in Curtis, The Law of Arson, Evidence; Opinions, § 422, pp. 441, 442:

"One who observes a fire, even though he is an experienced fireman, will not be permitted to express his opinion as to its cause or origin. Nor should the court admit the opinion of one who makes a subsequent investigation of the fire, although he may qualify as an expert. He should detail the facts coming to his attention and permit the jurors to draw their own conclusions as to the cause. * * * ." See *People* v. *Grutz*, 212 N. Y. 72, 105 N. E. 843.

*Mitchell* v. *Commonwealth*, 141 Va. 541, 565, 127 S. E. 368, involves the prosecution of a bank officer for making entries with

intent to conceal the true state of his account. There we made the following observation:

"It is assigned as error that the trial court, over the objection of the accused, permitted a witness for the Commonwealth to be asked and to answer the following question: 'Will you state whether or not the effect of such entries made upon the books of the bank would be to conceal the true state of the account of John Mitchell, Jr., in the bank?' To which the witness replied: 'Yes.' The question was a leading one put to a witness not shown to be an expert. But whether expert or not, it called for the opinion of the witness upon what was practically the very issue to be tried by the jury, and not to what was disclosed by the books of the bank. He was asked as to the 'effect' of such entries. This was a question to be determined by the jury from the evidence in the case and not from the opinion of an adverse witness. In *Thornton* v. *Commonwealth,* 113 Va. 736, 73 S. E. 481, the case was reversed solely on the ground that a very similar question was allowed to be asked an expert witness." *Redman* v. *Hotel Corp.,* 138 W. Va. 456, 76 S. E. 2d 759.

In the recent case of *Newton* v. *City of Richmond,* 198 Va. 869, 875, 96 S. E. 2d 775, accused was convicted in the court below for operating his vehicle while under the influence of intoxicants. In reversing and remanding the case for a new trial, Mr. Justice Miller, speaking for the court, said *inter alia*:

"No specific objection was made to that part of Dr. Kaye's testimony which says that in his opinion the person whose blood he analyzed was intoxicated 'to a degree where he was not fit to operate an automobile.' Yet upon a retrial he should not be allowed to express his opinion upon accused's *fitness 'to operate an automobile.'* To do so goes beyond giving expert testimony as to degrees of intoxication and invades the province of the jury."

The hypothetical question propounded to Hydrick and his response thereto were highly prejudicial to accused and constituted reversible error. It invaded the province of the jury as to the ultimate issues to be decided. Those issues were (1) whether or not the fire was of incendiary origin, and (2) whether or not Ramsey was the criminal agent. While Hydrick's answer told the jury in his opinion the fire was of incendiary origin, yet the form of the question and the answer to it unquestionably point to Ramsey as the guilty agent. Under the facts in this case the jury was able to form a correct opinion without the aid of expert testimony, and such

252

testimony was not necessary or proper to explain or elucidate the subject under investigation.

For the reasons stated, the judgment of conviction is reversed, the verdict set aside, and a new trial awarded if the Commonwealth be so advised.

*Reversed and remanded.*