Present:   Carrico, C.J., Compton, Lacy, Hassell, Keenan, and
Kinser, JJ., and Poff, Senior Justice

LEBAN A. HUSSEN
                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 980940              January 8, 1999

COMMONWEALTH OF VIRGINIA

              FROM THE COURT OF APPEALS OF VIRGINIA

     In this appeal, we consider whether an expert witness'

testimony improperly invaded the province of the jury.

     Leban A. Hussen was convicted by a jury in the Circuit

Court of Fairfax County of the rape and forcible sodomy of

Donyala G. Hucaby and sentenced to serve 15 years in the

penitentiary.  The circuit court confirmed the verdicts, and

the Court of Appeals denied the defendant's petition for

appeal.  The defendant filed a habeas corpus petition and

asserted that his former appellate counsel failed to seek an

appeal from the judgment of the Court of Appeals.  The

Commonwealth agreed, and we held that the defendant was

entitled to pursue a delayed appeal to this Court.  We awarded

the defendant an appeal.

     We will summarize the relevant facts and inferences

deducible therefrom in the light most favorable to the

Commonwealth, the prevailing party below.  See Davidson v.

Commonwealth, 244 Va. 129, 132, 419 S.E.2d 656, 658 (1992).

The defendant met Hucaby during a party at Howard University

in September 1993.  The defendant, who was a stranger to Hucaby, approached her at the party while she was conversing with friends.  The defendant told Hucaby that he was a member of an entertainment group and inquired whether she was interested in working for the group.  The defendant asked Hucaby her name, address, and telephone number, which she provided to him. The defendant told Hucaby that he "found [her] attractive" and asked if they could "go out to dinner sometime."

The next evening, the defendant made a telephone call to Hucaby, who was not in her dormitory at the time of the call. The defendant left a message on her answering machine.  The defendant called Hucaby later that night, around 12:15 a.m., and asked if he could see her.  She decided to go out with him because she thought they might have a late dinner.

The defendant arrived at Hucaby's dormitory room and informed her that his roommate had given him a ride there.  He asked if they could go to his house.  In response to Hucaby's question, "why are we going to your house?", the defendant replied that his sister had prepared a meal and he wanted to "get to know [Hucaby] better."  Hucaby told the defendant that she did not intend to "do anything [of a sexual nature], if that was his intention" and further stated, "I'm practicing abstinence."

The defendant's roommate drove the defendant and Hucaby to the defendant's house in Fairfax. They arrived at the house about 2:00 a.m. Hucaby told the defendant that she needed to return to her dormitory no later than 4:00 a.m.

Upon arrival at the defendant's house, Hucaby used a telephone to call her roommate to let her know that Hucaby had arrived safely. After she finished speaking to her roommate, Hucaby talked to the defendant in the kitchen for a while. There, he made an effort to kiss her, but she rejected his advances.

The defendant suggested that Hucaby accompany him to his bedroom because he did not have any furniture in other rooms in the house. She went to his bedroom which contained a mattress on the floor adjacent to a wall, a box spring adjacent to another wall, and a lamp. The defendant closed the bedroom door, and Hucaby sat on the mattress. They conversed for a while and, during the conversation, the defendant repeatedly asked Hucaby for a kiss. Eventually, they kissed for about "four seconds," and they began to talk some more.

During this conversation, Hucaby informed the defendant that she was a virgin. Subsequently, Hucaby looked at her watch and realized that the time was about 3:40 a.m., and she told the defendant she needed to return to her dormitory. The

3

defendant, who had previously promised Hucaby that his roommate would drive her home, responded that his roommate had gone, but that he would be back.  The defendant's roommate, however, never returned.

Hucaby, who felt "stranded" at the defendant's house, told him that she was very sleepy and she needed to go home. The defendant responded that she could go to sleep at his home until someone was able to take her back to her dormitory.

Hucaby, who was fully clothed, got into the defendant's bed.  She told him that she was going to go to sleep.  After about 10 seconds, the defendant told her that he wanted to be affectionate.  She tried to move away from him, and she told him that she did not "want to be affectionate."  He grabbed her arm and told her "not to be foul."  She tried to push him away.  He tried to kiss her as she tried to push him away.  He put his hand around her throat and said, "[y]ou came into this house under your own free will, and I can make it seem as though you were never here.  And no one will say you were here."  He also told her that "I have something under the bed."

The defendant told Hucaby to remove her clothes.  When she refused, he removed her clothes and raped her.  After he raped her, he forced her to perform an act of oral sodomy upon him.  Then, he raped her again.  After he raped Hucaby, the

4

defendant went to sleep. Hucaby went to sleep, and when she awakened, it was still dark outside. She called her roommate and obtained directions to the nearest location of the public transportation system. She went to the public transportation system and rode a subway to her dormitory.

Hucaby did not inform anyone that she had been raped and sodomized until three days later, when she went to the Howard University Medical Center. She was examined by Dr. Jean Williams, who determined that Hucaby had sustained a laceration approximately one-half centimeter just below her vaginal introitus, which is the area just below the vaginal opening.

During the trial, Suzanne L. Brown, a sexual assault nurse examiner at Fairfax Hospital, qualified as an expert witness. She was permitted, over the defendant's objection, to give the following testimony which is at issue in this appeal:

> "Q Now that you've been qualified as an expert. You have received medical information concerning Donyala Hucaby, correct?
> "A Correct.
> "Q With that information can you form a professional opinion based upon a reasonable degree of medical certainty as what would be consistent with an injury such as that?
> "A Yes, I can.
>                    . . . .
> "Q Knowing what you know about the injury and knowing -- let's talk now about the female response, normal female response. Is there a term for that?

5

"A     Yes, the human sexual response.

. . . .

"Q     And tell the ladies and gentlemen of the jury please what it is, this human sexual response.

"A     The human sexual response is a [sic] involuntary what happens during or just prior to sexual intercourse and a lot of it has to do with — the first phase is when the person is sexually excited causing lubricant to form in the vaginal area.

"The second part of that causes some actual structural changes to the entire vaginal area.  One of the changes that occurs is that the labia majora which are the outer lips of the vaginal opening actually thin out and flatten against the wall of the vagina.  After —

"Q     Where was this injury with respect to where you're speaking of now?

"A     Just below the vaginal opening.

. . . .

"Q     Okay.  After the outer labia majora flattens out then the smaller lips, the labia minora, will engorge and actually move away from the vaginal opening to allow for a penis to enter the vagina.  The vagina will also elongate causing a little bit of a shelving area to guide the penis into the vagina.

"Q     Now, with what you know about the human sexual response and with what you know about the injuries that Donyala Hucaby received can you give — let me add something to that hypothetical.

"Suppose for these questions that Donyala Hucaby was a virgin and that she had had sexual intercourse several days prior to being examined. Can you give an opinion as to whether or not these injuries were consistent with a first time intercourse?

"MR. DEVINE:  Your Honor, for the reasons I stated earlier I will object to that question.

"THE COURT:   . . . .  Overruled.

"Proceed.

"Q     Please tell the ladies and gentlemen of the jury whether these injuries were consistent with a woman having sex for the first time.

"A     They are not consistent with a virgin having sex for the first time.

"Q     Are these injuries —

6

"A JUROR: I didn't hear.
"Q Could you please repeat that?
"A I said that the injuries, when a virgin has sex for the first time this is not a typical area for an injury to be.
"Q And we're speaking of consensual?
"A Correct."

The defendant, relying principally upon Bond v. Commonwealth, 226 Va. 534, 311 S.E.2d 769 (1984), and Llamera v. Commonwealth, 243 Va. 262, 414 S.E.2d 597 (1992), argues that the trial court erred in allowing Brown to testify that the complaining witness' injury was not consistent with consensual sex because consent was an ultimate issue of fact at trial, and Brown's testimony impermissibly invaded the province of the jury. We disagree with the defendant.

We have held consistently that the admission of expert testimony upon an ultimate issue of fact is impermissible because it invades the function of the fact finder. Jenkins v. Commonwealth, 254 Va. 333, 336, 492 S.E.2d 131, 132 (1997); Llamera, 243 Va. at 264, 414 S.E.2d at 598; Bond, 226 Va. at 538, 311 S.E.2d at 771-72; Cartera v. Commonwealth, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978); Webb v. Commonwealth, 204 Va. 24, 33, 129 S.E.2d 22, 29 (1963); Ramsey v. Commonwealth, 200 Va. 245, 250, 105 S.E.2d 155, 158 (1958).

In Bond, we considered whether the circuit court misapplied this rule by permitting an expert witness to testify about the cause of the victim's death. The defendant

had been charged with murder, and one of the issues that the Commonwealth was required to prove was whether the victim's death "was brought about by the criminal agency of another," which was an ultimate issue of fact. 226 Va. at 537, 311 S.E.2d at 771. The expert witness testified, over the defendant's objection, that he had "made a determination that [the victim's] death was as a result of a homicide." Id. We held that the expert witness' testimony invaded the province of the jury because the ultimate factual issue to be decided by the jury was whether the victim jumped intentionally to her death, fell accidentally to her death, or was thrown to her death. Id. at 539, 311 S.E.2d at 772.

In Llamera, we also considered whether a circuit court improperly permitted an expert witness to express an opinion upon an ultimate fact in issue. There, a police detective, who had qualified as an expert witness on the subject of the sale, distribution, marketing, packaging, and effects of narcotics, opined that cocaine, which had been seized in the defendant's store, "was packaged that way for distribution." The detective testified, over the defendant's objection, that the quantity of cocaine found "would suggest that the owner of the cocaine was a person who sold cocaine" and that such quantity was inconsistent with personal use. Llamera, 243 Va. at 264, 414 S.E.2d at 598. We held that the Commonwealth was

8

required to prove that the defendant possessed the cocaine and that the defendant did so with the intent to distribute and that these elements were ultimate issues of fact to be resolved by the jury. Id. at 265, 414 S.E.2d at 599. We concluded that the challenged testimony was inadmissible because the detective expressed an opinion upon an ultimate issue of fact when he testified that the owner of the cocaine was a person who sold cocaine. Id.

The present appeal, however, is clearly distinguishable from, and is not controlled by, our decisions in Llamera and Bond. It is true, as the defendant here asserts, that the Commonwealth was required to prove, among other things, that he forced the victim to engage in sexual intercourse against her will. However, Brown's testimony was not an opinion that the sexual intercourse between the defendant and the victim was against her will. Rather, Brown's testimony, which must be viewed as a whole, reflects her opinion that the unique nature of the victim's laceration, particularly the location of the injury, was not consistent with consensual, first time intercourse. Such an opinion by this expert witness is not a comment on one of the ultimate issues of fact to be determined by the jury, that is, whether the defendant's conduct was against the victim's will. See Davis v. Commonwealth, 12 Va. App. 728, 731-32, 406 S.E.2d 922, 923-24 (1991) (detective's

9

testimony that a certain quantity of drugs was not consistent with personal use did not constitute an opinion that the defendant intended to distribute marijuana and, thus, did not invade the province of the jury).

Accordingly, we will affirm the judgment of the Court of Appeals.

Affirmed.

SENIOR JUSTICE POFF, with whom JUSTICE LACY and JUSTICE KEENAN join, dissenting.

The issue before this Court turns upon the testimony of a registered nurse employed by a hospital as a "Sexual Assault Nurse Examiner".  The nurse qualified in the trial court as an expert in the examination of victims of sexual assault.  Asked to explain the term "human sexual response", the witness testified that "the first phase is when the person is sexually excited causing lubricant to form in the vaginal area" and that the "second part of that causes some actual structural changes" that enlarge access through "the vaginal opening". Basing her testimony on a doctor's report of his examination, the nurse said that Hucaby had sustained a "half a centimeter laceration just below . . . the vaginal opening."

Responding to questions posed by the prosecutor, the nurse then testified as follows:

10

Question:  Please tell the ladies and gentlemen of the jury whether these injuries were consistent with a woman having sex for the first time.

Answer:  They are not consistent with a virgin having sex for the first time.

. . .

Question: Could you please repeat that?

Answer:  I said that the injuries, when a virgin has sex for the first time this is not a typical area for an injury to be.

Question:  And we're speaking of consensual?

Answer:  Correct.

The trial judge overruled Hussen's objection to that testimony.

The nurse's statement that the situs of Hucaby's injury was "not a typical area for an injury to be" and her acknowledgement that she was "speaking of consensual" was an expression of her expert opinion that the injury was the result of a sexual assault.  The import of that language was reinforced by the nurse's further testimony when she agreed that "when the human sexual response is triggered . . . injuries do not occur."  Clearly, a lay juror would conclude that such testimony reflects the opinion of a witness, a witness qualified by the trial judge as an expert, that Hucaby's injury was one suffered by a person whose sexual

11

response had not been triggered, i.e., that the sexual conduct was not consensual.

"We consistently have held that the admission of expert opinion upon an ultimate issue of fact is impermissible because it invades the function of the fact finder." Llamera v. Commonwealth, 243 Va. 262, 264, 414 S.E.2d 597, 598 (1992) (holding inadmissible expert's opinion that quantity of cocaine seized was inconsistent with personal use and consistent with intent to distribute). Such an invasion of the function of the fact finder "implicates the due process and fair trial guarantees of the Constitution of the United States." Jenkins v. Commonwealth, 254 Va. 333, 336, 492 S.E.2d 131, 132 (1997) (error in admission of expert opinion that child had been sexually abused was not harmless). As we said in Cartera v. Commonwealth, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978), "it was improper to permit the doctor to express his opinion that the girls had been raped. Whether rape had occurred was the precise and ultimate issue in the case." See also Bond v. Commonwealth, 226 Va. 534, 537, 311 S.E.2d 769, 771 (1984) (murder conviction reversed because expert "ruled out" possibility of suicide and accident and classified victim's death as "result of a homicide").

Notwithstanding our decisions in these cases, the Commonwealth contends that "the Court of Appeals has held it

proper for an expert to opine that a quantity of drugs in a defendant's possession was not consistent with personal use." The Commonwealth relies upon Davis v. Commonwealth, 12 Va. App. 728, 406 S.E.2d 922 (1991).  But Davis did not hold that such testimony is "proper" if it constitutes an expert opinion on an ultimate fact in issue.  Rather, the court held that the testimony was admissible only because it had not "violated this long-established rule."  Id. at 731, 406 S.E.2d at 924. Specifically, the court said that "we find that [the expert's] testimony . . . did not constitute an opinion that Davis had an intent to distribute the marijuana found in his house."[1] Id. at 732, 406 S.E.2d at 924.

Citing ten other decisions of the Court of Appeals in criminal drug cases[2], the Commonwealth also argues that "as a

---

[1] The marijuana was found in the basement of Davis' house, and he was one of three occupants of the dwelling.  Davis' cousin, one of the occupants, testified that he had purchased the marijuana and hidden it in the basement.  The Court of Appeals noted that "[a] given quantity of a controlled substance can be possessed jointly by several individuals. . . .  In such a case, that amount might be inconsistent with an individual's personal use, and yet not establish an intent to distribute."  Id. at 732, 406 S.E.2d at 924.  The Court concluded that the detective's testimony, considered in context with the facts and the jury instructions, was appropriate for the jury's consideration because it was not the ultimate issue in the case.

[2] Welshman v. Commonwealth, 28 Va. App. 20, 37, 502 S.E.2d 122, 130 (1998); Lovelace v. Commonwealth, 27 Va. App. 575, 587, 500 S.E.2d 267, 273 (1998); Spivey v. Commonwealth, 23 Va. App. 715, 479 S.E.2d 543 (1997); Jones v. Commonwealth,

13

matter of practice such [expert] testimony is routinely received."  But the admissibility of expert opinion was not in issue in those cases.  In each, the issue was sufficiency of the evidence; expert testimony was discussed only as an adjunct to the circumstantial evidence underlying the conviction.

Here, as in Cartera, "(w)hether rape had occurred was the precise and ultimate issue in the case."  219 Va. at 519, 248 S.E.2d at 786.  The nurse's testimony on that question was an opinion of an expert.  That opinion was patently prejudicious. I would hold that the trial judge erred in admitting that evidence, annul the conviction, reverse the judgment of the Court of Appeals denying Hussen's petition for appeal, and remand the case to the Court of Appeals with direction to remand the case to the trial court for further proceedings.

---

23 Va. App. 93, 474 S.E.2d 825 (1996); Williams v. Commonwealth, 21 Va. App. 263, 463 S.E.2d 679 (1995); Wilkins v. Commonwealth, 18 Va. App. 293, 443 S.E.2d 440 (1994); Hardy v. Commonwealth, 17 Va. App. 677, 440 S.E.2d 434 (1994); Poindexter v. Commonwealth, 16 Va. App. 730, 432 S.E.2d 527 (1993); Early v. Commonwealth, 10 Va.