COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Bumgardner and Frank
Argued at Richmond, Virginia


MICHAEL RELL DOTSON

                                      MEMORANDUM OPINION* BY
v.    Record No. 1541-99-3        JUDGE JAMES W. BENTON, JR.
                                        SEPTEMBER 11, 2001
COMMONWEALTH OF VIRGINIA


          UPON A REMAND FROM THE SUPREME COURT OF VIRGINIA

            FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
                     Keary R. Williams, Judge

          Robert M. Galumbeck (Dudley, Galumbeck,
          Necessary & Dennis, on brief), for appellant.

          Virginia B. Theisen, Assistant Attorney
          General (Mark L. Earley, Attorney General, on
          brief), for appellee.


     A jury convicted the appellant, Michael Rell Dotson, of

felonious abuse and neglect of his infant son in violation of Code

§ 18.2-371.1(A).  On appeal, appellant contends that the trial

judge erred in (1) allowing a doctor to testify that the infant's

injuries were caused by or consistent with abuse or neglect, (2)

allowing a witness to testify about statements the infant's mother

made outside appellant's presence and failing to grant a mistrial

when the prosecutor argued to the jury that those statements

proved appellant's intent, (3) ruling that Code § 18.2-371.1(A)

---

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

did not require the Commonwealth to prove that an omission or refusal to provide care was willful, (4) refusing to instruct the jury that acts of omission or refusal must be willful, (5) ruling that his attorney could not argue to the jury that the Commonwealth was required to prove that an omission or refusal to provide care was willful, and (6) permitting the jury to consider evidence of improper nourishment and a healed leg fracture concerning the infant. He also contends the evidence was insufficient to support the verdict. For the reasons that follow, we reverse the conviction.[1]

I.

The grand jury indicted appellant as follows:

Abuse and Neglect of Children

> On or about July 13, 1996, [appellant] did unlawfully and feloniously as a parent, guardian, or other person responsible for the care of . . . a child under the age of eighteen, the date of birth being 11-25-95, by willful act or omission or refusal to provide any necessary care for the child's health cause or permit serious injury to the life or health of such child.
>
> In violation of § 18.2-371.1 of the Code of Virginia (1950) as amended.

---

[1] The Court of Appeals issued a memorandum opinion in this appeal on July 5, 2000. Following the Commonwealth's appeal to the Supreme Court, the Supreme Court remanded the appeal, by order of June 8, 2001, to this Court for reconsideration.

The grand jury indicted Anna Marie Dotson, the infant's mother, on the same charge.  The trial judge ruled that appellant and Dotson would be tried together.

At trial, the Commonwealth's evidence proved that, at the time of the incident giving rise to this prosecution, appellant and Dotson lived together for two or three years but were not married.  Appellant and Dotson had two children who were born during their relationship, a girl, age twenty-two months, and a boy, age seven months.  Appellant also had a teenage daughter, who lived with his parents.  The indictment concerned the baby boy.

On the morning of July 13, 1996, Dotson had arranged for appellant's daughter, who was then seventeen, to babysit appellant's and Dotson's baby boy.  The teenager testified that she had been frequently babysitting the baby "since he was born" and that on this morning she noticed a small bruise under the baby's eye.  She also testified that on several occasions when appellant and Dotson were not present in the room, she had seen their twenty-two-month-old girl pinch and slap the baby and throw bottles at him.  The teenager further testified that the baby had been experiencing problems with food that caused him to "belch back up [his milk] when you burped him."

The teenager testified that when she arrived in her car to get the baby, appellant was not at home.  She assisted Dotson in preparing the baby to go home with her, and she carried the baby to the car in his infant car carrier seat.  The teenager testified

- 3 -

that after she left appellant's home, she was driving faster than she should have been.  When she entered a curve in the road, she saw a car stopped in the middle of the road and "had to slam on [her] brakes" to avoid a collision.  The teenager testified that when she applied the brakes rapidly, she "heard it go thump."  The baby "fell out of the car seat and the car seat fell on top of him because [she] neglected to put [the baby] in . . . the seat, the way it's supposed to be."

After the teenager admitted during her direct examination that she had not related this incident when she testified at the preliminary hearing, the trial judge informed her out of the jury's presence that she would likely be prosecuted for perjury.  She responded to the judge that she was now being truthful.  She said she had not testified about the accident at the preliminary hearing because she "was scared [and] . . . didn't want [her] grandparents and [her] father [to know what happened]."  She said: "I knew they would be mad at me.  I was scared."  When the jury returned, the trial judge instructed the jury that the Commonwealth was entitled to prove the teenager had made a prior inconsistent statement but that the jury could only use proof of the prior inconsistent testimony "for purpose of contradicting this witness."

The teenager then testified that on a prior occasion she said she had driven slowly from appellant's residence and arrived home without incident.  She explained that she had lied at the

- 4 -

preliminary hearing because she "didn't want [her] grandparents to know what [she] had done [and] . . . didn't want [her] father to know because they would be mad at [her] and they wouldn't let [her] have anything to do with [the baby] any more." She testified that she "didn't think that anything was going to go this far . . . [and] didn't think that it would go further than little court." She further testified that she "was trying to protect [her]self."

The teenager testified that instead of putting the infant carrier on the back seat, she had placed it on the front seat of the car so that the baby "could look out the window . . . [while she] was driving." She could not strap the carrier on the front seat and had not secured either the baby or the seat properly. Thus, when she slammed on the brakes, the carrier seat had fallen onto the baby. Aware that the baby "was crying and screaming when he was in the floorboard" and was red in the face, the teenager "panicked." She continued to drive "up the road a little bit" before stopping and putting the infant carrier seat on the back seat of the car. She then gave the baby a bottle and tried to calm him before continuing home.

Appellant's sister testified that she received a telephone call from the teenager, her niece, and told the teenager to bring the baby to her house. When they arrived, the teenager's aunt immediately noticed that the baby was bruised and his arm was injured. The aunt believed the baby's arm, which was red and

swollen, may have been broken, and she called the baby's pediatrician, Dr. Ranje Patel. He directed her to take the baby to the hospital emergency room. She testified that she has never seen appellant or Dotson hit their children.

The triage nurse who examined the baby in the emergency room testified that she saw multiple bruises on the baby's face, a healed scab under his left eye, and bruises on his back and both legs. The baby's left arm was swollen and deformed. Whenever she touched or moved the arm, the baby cried. She testified that the healed wound on the face could have been caused by a fingernail. Although she testified that the color of the bruises on the baby's back and legs indicated they occurred at different times, she admitted that the color of a bruise does not always indicate age but may depend upon how hard an area is hit and how much blood comes to the area. She testified further that bruises "over bony prominences are usually darker than [bruises] over a fatty area." The nursing supervisor also testified that she saw bruises of different colors on the baby's body.

Dr. Sabry Radawi examined the baby and saw bruises all over his body and around his eyes. Some of the bruises appeared to be recent and others appeared older. He testified that the appearance of a bruise may vary because of the strength of a blow or the location on the body. Dr. Radawi also testified that if a person, who is falling or involved in an accident, brings his hands to the front of his face and receives a sudden blow, the

impact of hands into the face could cause "raccoon" eyes, the type of injury that the child had. After he viewed x-rays of the child's facial bones, skull, and left arm, Dr. Radawi diagnosed a fracture of the upper left arm. At his direction, the hospital personnel contacted the Department of Social Services and transferred the baby to a hospital in Roanoke.

In Roanoke, Dr. Hugh Johnson Hagan, an orthopedic surgeon, reviewed the x-ray and ordered an x-ray of the baby's major long bones. The x-ray revealed a fracture in the baby's left leg, which was in the process of healing. Dr. Hagan testified that the fracture most likely had occurred within one or two months and most likely had resulted from a direct blow to the bone. He further testified, however, that without knowing anything else except the existence of the break, it would be guesswork to say when and how it happened.

Dr. Donald Keys, a pediatrician, examined the baby two days after he was admitted to the hospital. Dr. Keys testified that "getting into the ages of bruises" from coloration "is a little bit difficult to say . . . [or] to be specific about." Dr. Keys testified that it is generally accepted that color indicates different onset; however, he could not "say whether [the baby's bruises] all occurred on the same day or whether they occurred several days apart." He testified that "[t]hey could have potentially all occurred on the same date" and could have occurred on the day the baby was taken to the hospital. Dr. Keys also

testified that the baby's leg fracture was more than six weeks old and could have occurred at anytime after the baby's birth. He further testified that the x-ray indicated that another break in the leg had healed itself. He agreed that because the seven-month-old baby was not putting weight on his legs, the fracture might only manifest itself by the baby occasionally becoming "irritable and fussy." He testified that the break in the baby's arm "was a very recent break."

Dr. Keys also testified that the baby was "very underweight." He weighed eleven pounds when admitted to the hospital and gained ten ounces during his four-day stay. Although Dr. Keys had not reported evidence of dehydration, he testified that two and one-half percent dehydration would not be detected during a physical examination. Dr. Keys agreed that if the baby was dehydrated two and one-half percent and rehydrated while in the hospital, the baby's weight gain would be about ten ounces.

Dr. Keys testified that, although the baby had been premature at birth, "at seven and a-half months [the baby] should have had a lot more fat and been heavier." Based on a growth chart and his examination of the baby's records, Dr. Keys testified that the baby initially "made nice progress" but then "flat-lined," which meant the baby did not grow, between five and seven months. He testified that the baby's pattern was "definitely abnormal" and indicated that the baby "didn't receive adequate nourishment during [the] time period [when he flat-lined]." He opined that

the bruises, broken bones, and lack of weight gain indicated "that [the baby] has been abused and there's no other explanation for that."

Dr. Keys testified that the lab reports which were done for anemia and total protein were within normal limits except "[t]he albumin was below the range of normal intake."  Although he testified that the baby suffered from malnourishment or malnutrition, he testified that those terms simply mean that there is faulty nutrition.  On cross-examination, he further testified as follows:

> It just sounds like what you're asking is, if you give diluted formula, does the baby grow well?  The answer to that is no and that's true; however, for the first five and a-half months this baby grew appropriately, so that tells me the baby got the proper amount, the proper dilution, and then at five months something changed.  I don't know what that something was.  You're supposing, and I have no knowledge of this, that she started changing the way she prepared the formula; that is a possibility; that's all I can say. . . .  I couldn't say . . . It could have resulted from lack of knowledge.

He testified, however, that most parents by the time they have a second child are more familiar with feeding and what is proper feeding.

The Commonwealth proved that two deputies from the sheriff's department and two employees of the county's social services department met with appellant and Dotson at their residence the same afternoon the baby was taken to the hospital.

- 9 -

They informed appellant and Dotson that they were investigating a complaint of child abuse and had taken custody of the baby. The trial judge instructed the jury that statements made by Dotson "may not be considered in [their] deliberations regarding [appellant]."

The social worker testified that Dotson "became upset." Both parents "were surprised" to learn the baby had been taken to the hospital and said they did not know how the baby's arm could have been broken. When asked if the baby had any injuries, Dotson said the older child had hit the baby two days earlier with the baby's feeder, causing a bruise under the baby's eye. Dotson said the older child "appeared to be jealous" and tried to hit the baby if Dotson held the baby during feeding.

During the interview, appellant and Dotson also "stated that they frequently fight and hit on each other." Dotson said they sometimes fought because appellant did not believe the baby was his. Dotson also said she was afraid of appellant and that the beating and fighting had occurred "ever since they had been together." Both appellant and Dotson "indicated that they were aware that [the older child] was watching them fighting and then that [the older child] was going to the crib and climbing in and hitting on [the baby]." Dotson also said that when she was doing housework the older child would climb in the crib and hit the baby.

Appellant told the deputies and one of the social workers that he had "done very little of the child rearing, but that he did . . . play with the children when he came home from work." He also said he did not know how the injuries occurred. The social worker testified that the older child appeared healthy and seemed to be "on target developmentally." A social worker also testified that appellant and Dotson received public food assistance and Medicaid for their children.

After the Commonwealth presented its case-in-chief, the trial judge overruled motions to strike the evidence. Dr. Ranje Patel, the baby's pediatrician, then testified for the defense. Dr. Patel testified that he had seen the baby six times prior to July 13 and had treated the baby on July 9 for congestion and coughing. He thoroughly examined the baby on July 9 and saw no bruises on the child. Dr. Patel testified that he saw no broken bones or other injuries during the seven months he treated the baby. Although he said that a minor fracture in a baby's bone could remain undetected unless there are symptoms, he testified that he performed thorough examinations of the baby and saw no bruises and detected no broken bones. He testified that during the course of his treatments he had no need to order x-rays of the baby.

Dr. Patel also testified that Dotson had raised issues with him concerning feeding the baby, that he had continuously discussed feeding issues with Dotson, and that he advised her

- 11 -

how to properly feed the baby.  He testified that there was a "problem ongoing from day one, the speaking about the [baby's] formulas," and that he addressed the issue of proper feeding during most of the baby's visits.  Appellant offered no other witnesses.

At the conclusion of the evidence, the trial judge again overruled motions to strike the evidence.  Appellant tendered a jury instruction defining "willful" as "an act or omission done with bad purpose, without justifiable excuse and without ground for believing it is lawful."  When the Commonwealth objected that Code § 18.2-371.1(A) did not require proof that an omission or refusal be willful, appellant argued that willful modified act and omission.  The trial judge refused the instruction and ruled that neither the omission nor the refusal to provide care had to be willful.  The judge also instructed appellant's attorney that he could not argue to the jury that an omission or refusal to provide care must be willful.  This appeal followed from the jury's verdict convicting appellant of "Abuse and Neglect of Children by Willful Act or Omission or Refusal to Provide Necessary Care, Causing or Permitting Serious Injury as charged."

## II.

Appellant contends the trial judge erred in permitting Dr. Keys to testify that the baby had been abused.  The

- 12 -

Commonwealth argues that the testimony was not a comment on the ultimate issue of fact.

The principle is well established that "[e]xpert opinion on an ultimate fact in issue is inadmissible in a criminal case because it 'invade[s] the province of the jury.'" Jenkins v. Commonwealth, 254 Va. 333, 336, 492 S.E.2d 131, 132 (1997) (citation omitted). Moreover, "an opinion of a witness the judge has found to be an expert carries great weight with [jurors]." Bond v. Commonwealth, 226 Va. 534, 538, 311 S.E.2d 769, 772 (1984).

In response to the prosecutor's question whether he "would . . . consider these [injuries] consistent with child abuse," Dr. Keys testified that "look[ing] at everything together . . . means that [the baby] has been abused and there's no other explanation for that." It is true, as the Commonwealth argues, that although Code § 18.2-371.1 is styled "Abuse and neglect of children," the body of the statute does not contain that precise wording. Nonetheless, as the Supreme Court indicated in Webb v. Commonwealth, 204 Va. 24, 33, 129 S.E.2d 22, 29 (1963), the doctor's testimony was an opinion upon "the very issue in this case." His testimony "had the effect of stating a conclusion" which was the heart of the matter the jury had to decide. Id.

Any doubt in that regard is dispelled by the wording of the indictment, which is styled "Abuse and Neglect of Children." In addition, the finding instructions to the jury state that "[t]he

defendant is charged with the crime of abuse or neglect of a child" and contains the words "offense of abuse or neglect" in three other places. The finding instruction concerning punishment also recites that the offense is "Abuse and Neglect of Children" and the verdict form likewise recites that the offense is "Abuse and Neglect of Children."

Because of the similarity of the wording used in these instances, this case differs from Hussen v. Commonwealth, 257 Va. 93, 511 S.E.2d 106 (1999), cited by the Commonwealth. There, the Court allowed an expert's testimony because she said an alleged rape victim's injuries were not consistent with consensual sexual activity, but did not comment specifically on "whether the defendant's conduct was against the victim's will." 257 Va. at 99, 511 S.E.2d at 109. In this case, the expert's words clearly addressed "one of the ultimate issues of fact to be determined by the jury," id., as the instructions and verdict form communicated that issue to the jury. Thus, this case more closely resembles Jenkins, where the Court found that an expert's testimony that a child "'had been sexually abused,'" 254 Va. at 336, 492 S.E.2d at 133, improperly influenced the jury's sentencing in a case where "sexual abuse" was an element of the crime. Id. at 337-38, 492 S.E.2d at 133-34. Accordingly, we hold that the trial judge erred in allowing that opinion testimony.

Appellant contends the trial judge erred by permitting a witness to testify about statements which Dotson made to the social worker outside his presence and which alleged prior bad acts.

The evidence proved that while the social worker was questioning appellant and Dotson in their home, appellant left the room to show the deputies another room in the house. Dotson continued her conversation with the social worker. She said that she and appellant fought often, that she had sole responsibility for the housework and child rearing, and that, if she did not have appellant's dinner ready when he came home, appellant would "start hitting on her." Dotson also said they fought frequently because appellant believed the baby was not his son. In addition, Dotson related an incident in which appellant threw a lamp at her when she was pregnant with the baby. She said she was afraid of appellant.

Appellant contends the testimony was hearsay and prejudicial to him. Prior to this testimony, however, the trial judge gave the jury a cautionary instruction that they were to consider Dotson's statements only in her case and not against appellant. In final instructions to the jury before their deliberations, the judge again instructed the jury as follows:

> In considering your verdict against
> [appellant], you may not consider any
> statement made by Anna Dotson which was

> introduced as evidence in this trial. Such statement may only be considered in your deliberations in the case of Anna Dotson.

Appellant assumes that the jury considered that evidence in convicting him. We do not make that assumption. The trial judge twice cautioned the jury to consider the evidence only in its deliberation in Dotson's case. We presume that the jury "follow[ed] prompt cautionary instructions regarding the limitations placed upon evidence." Burley v. Commonwealth, 29 Va. App. 140, 147, 510 S.E.2d 265, 269 (1999) (citing LeVasseur v. Commonwealth, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983)). Nothing in the record clearly shows that the jury disregarded those instructions.

Although appellant also contends the admission of these statements violated his rights under the confrontation clause, that argument was not made at trial and, therefore, is now barred by Rule 5A:18.

IV.

Appellant contends that when the prosecutor made her closing argument and referred to Dotson's statements, the trial judge erred in refusing his motion for a mistrial.

The record indicates that when the prosecutor made her closing statements about the social worker's conversation with Dotson and appellant at their residence, she pointed to appellant and said "he . . . took a lamp and threw it at her." The trial judge sustained appellant's objection, ruling that the

prosecutor "has gotten a little untracked in view of the Court's ruling regarding this testimony." Later, in her rebuttal argument, the prosecutor referred to appellant's attorney's argument that appellant did not generally carry the baby and said, "Well, he didn't think it was his child . . . continually fighting with his wife, accusing that he wasn't his child." The trial judge again sustained appellant's objection, and denied the motion for a mistrial.

The principles governing the review of this issue are well established.

> The grant or denial of a mistrial falls within the sound discretion of the trial court. A mistrial should not be granted for minor irregularities and mistakes in a trial which can be cured by a direction from the trial court to disregard the irregularity or mistake. A mistrial is not appropriate unless "there is a manifest probability that objectionable evidence or statements before the jury are prejudicial to the adverse party."

Clark v. Chapman, 238 Va. 655, 661, 385 S.E.2d 885, 888 (1989) (citations omitted).

Although the evidence had been admitted in the prosecution against Dotson, in each instance, the trial judge sustained appellant's objection. Moreover, the trial judge twice had cautioned the jury to use the evidence only against Dotson, and not against appellant. In view of these circumstances, we cannot say there was a manifest probability that the

prosecutor's action and statement were so prejudicial that they were not cured by the trial judge's rulings.

V.

Appellant contends the trial judge erred in ruling that Code § 18.2-371.1(A) did not require the Commonwealth to prove omissions or refusals of care were willful, in refusing to instruct the jury as to the definition of willful, and by forbidding appellant's attorney to tell the jury that an omission or refusal of care must have been willful. The Commonwealth argues that the trial judge's rulings are not reversible error because they did not prejudice appellant.

In pertinent part, the child abuse and neglect statute, which is charged in the indictment, provides as follows:

> A. Any parent, guardian, or other person responsible for the care of a child under the age of eighteen who by willful act or omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child shall be guilty of a Class 4 felony. For purposes of this subsection, "serious injury" shall include but not be limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, (vi) forced ingestion of dangerous substances, or (vii) life-threatening internal injuries.

> B. Any parent, guardian, or other person responsible for the care of a child under the age of eighteen whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a

- 18 -

    reckless disregard for human life shall be
    guilty of a Class 6 felony.

Code § 18.2-371.1 (emphasis added).

The statute explicitly contains the disjunctive elements of

"willful act or omission or refusal to provide any necessary

care."  Id.  We would strain the meaning of the statute to read

it to require a "willful act" but an "omission" or "refusal"

that was not willful.  In Ellis v. Commonwealth, 29 Va. App.

548, 513 S.E.2d 453 (1999), we addressed the requirements of

proof to establish a violation under Code § 18.2-371.1.  We held

that "something more than negligence must be proved beyond a

reasonable doubt to support [the] conviction" under the statute.

Id. at 555, 513 S.E.2d at 457.  The ordinary definition of the

statutory element, "omission," means "[a] failure to do

something; esp., a neglect of duty."  Black's Law Dictionary

1116 (7th ed. 1999).  In addition, although a refusal is an

intentional act, it is not necessarily a willful act.  Refusal

is defined to mean a "rejection of something demanded."

Webster's Third New International Dictionary 1910 (1981).

In Ellis, we held that a negligence standard was

insufficient to support a conviction under the statute.  We also

noted that "inattention and inadvertance have not been

heretofore equated with actions taken willfully."  29 Va. App.

at 556, 513 S.E.2d at 457.

        "Willful" generally means an act done with a
        bad purpose, without justifiable excuse, or

without ground for believing it is lawful. See Richardson v. Commonwealth, 21 Va. App. 93, 99, 462 S.E.2d 120, 123 (1995). The term denotes "'an act which is intentional, or knowing, or voluntary, as distinguished from accidental.'" Snead v. Commonwealth, 11 Va. App. 643, 646, 400 S.E.2d 806, 807 (1991) (quoting United States v. Murdock, 290 U.S. 389, 394, 54 S. Ct. 223, 78 L.Ed. 381 (1933)). The terms "bad purpose" or "without justifiable excuse," while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality. See Murdock, 290 U.S. at 395-95, 54 S. Ct. 223.

Id. at 554, 513 S.E.2d at 456 (footnote omitted).

Thus, we hold that to sustain a conviction under this statute, the evidence must prove beyond a reasonable doubt a "willful act or [willful] omission or [willful] refusal" regarding the proscribed conduct. This conclusion necessarily follows from the application of ordinary grammatical principles and the general rule that "proper grammatical effect will be given to the arrangement of words in a sentence of a statute." Harris v. Commonwealth, 142 Va. 620, 624, 128 S.E. 578, 579 (1925). "We presume that when drafting this statute, the legislature understood the basic rules of grammar." Frere v. Commonwealth, 19 Va. App. 460, 464, 452 S.E.2d 682, 685 (1995). Moreover, even if there is a choice to be made in reading the statute, the principle is well established that "[c]riminal statutes are to be 'strictly construed against the Commonwealth and in favor of [a] citizen's liberty' . . . [and] must be construed so as to proscribe only conduct which the legislature

- 20 -

clearly intended to be within the statute's ambit." King v. Commonwealth, 6 Va. App. 351, 354-55, 368 S.E.2d 704, 706 (1988) (citations omitted).

The trial judge incorrectly ruled that the statute did not require the Commonwealth to prove that acts of omission or refusal of care were willful and, likewise, erred in barring appellant's attorney from arguing to the jury that such proof was required for conduct alleged to be an omission or a refusal of care. Because the judge's error lessened the conduct on which the jury could convict, we cannot say that the error was not prejudicial. The defense's inability to argue fully hindered its ability to suggest reasonable doubt and taints the legitimacy of the jury's verdict.

As a consequence of the judge's ruling on the statute's meaning, he also refused to instruct the jury that "'Willful,' in this case, means an act or omission done with bad purpose, without justifiable excuse and without grounds for believing it is lawful." The instruction was a correct statement of the law. See Ellis, 29 Va. App. at 554, 513 S.E.2d at 456 (citing Richardson, 21 Va. App. at 99, 462 S.E.2d at 123).

It is a well established, elementary principle, "that a jury must be informed as to the essential elements of the offense; a correct statement of the law is one of the essentials of a fair trial." Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (internal quotations and citation

omitted).  "Unless [the essential] elements [of an offense] are defined by instructions . . . to . . . the jury . . . , they cannot properly determine whether the Commonwealth has carried its burden [to prove each essential element of the offense beyond a reasonable doubt]."  Dowdy v. Commonwealth, 220 Va. 114, 116, 255 S.E.2d 506, 508 (1979).  Moreover, a hallmark of a fair trial is that "'instructions . . . should inform the jury as to the law of the case applicable to the facts in such a manner that [the jury] may not be misled.'"  Cooper v. Commonwealth, 2 Va. App. 497, 500, 345 S.E.2d 775, 777 (1986) (citation omitted).

The rejected instruction would have informed the jury of the level of culpability required to convict appellant of the offense.  Although the trial judge instructed the jury on the meaning of "gross" and "culpable" conduct, which are elements of the lesser-included offense, without further instruction, the jury was left to predicate a conviction upon a finding of a mere omission or a non-willful refusal.  The jury received no instruction as to what type of acts were "willful."  "[W]hen a principle of law is vital to a defendant in a criminal case, a trial court has an affirmative duty properly to instruct a jury about the matter."  Jimenez v. Commonwealth, 241 Va. 244, 250, 402 S.E.2d 678, 681 (1991).

Because the jury, as instructed, could have convicted appellant of an omission or refusal that was not willful, we

cannot say that the trial judge's errors did not prejudice appellant.

                                  VI.

Appellant contends that the trial judge erred by failing to strike the Commonwealth's evidence regarding malnourishment and the healed fracture.  He argues that the evidence permitted the jury to speculate as to causation.  The Commonwealth argues that those circumstances were discovered after the baby was delivered to the hospital and presented a jury issue.

These issues were circumstances that the jury was entitled to consider in weighing the evidence.  The principle is well established that "[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt."  Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983).  We find no error.

                                  VII.

"Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom."  Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).  As constitutionally required by In re Winship, 397 U.S. 358 (1970), "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979).

So viewed, the evidence proved that on July 13, 1996, when the significant bruising and injuries were first discovered on the baby, he was in the presence and care of appellant's teenage daughter. The teenager testified that, with the exception of a small bruise on his face, the baby was normal when she arrived at appellant's house and did not appear to have any injuries. She further testified that before leaving appellant's house with the baby in her car, she failed to secure the baby in the infant carrier and she put the infant carrier on the front seat. That failure, she testified, resulted in the baby falling to the floorboard of the car and being hit by the falling infant seat after she sped along the highway, entered a curve, and slammed on the brakes to avoid a stopped vehicle.

The Commonwealth argues that the jury could have disbelieved the teenager, the Commonwealth's witness, because she admitted at trial that she had testified differently at the preliminary hearing in order to avoid incurring the wrath of her grandparents and her father for injuring the child. We agree, of course, that the jury, as "fact finder . . . may reject testimony that has been impeached." Doss v. Commonwealth, 23 Va. App. 679, 685, 479 S.E.2d 92, 95 (1996). Even if we assume,

however, that the jury rejected this testimony, no evidence otherwise explains the cause of the baby's broken arm and severe bruising, which were evident when he was taken to the hospital that same day by the teenager and her aunt. Dr. Keys, a witness for the Commonwealth, testified that the bruises "could have potentially all occurred on the same date." The jury would have been left to speculate that the baby had those bruises when the teenager drove away from appellant's home with the baby.

The evidence clearly established that the baby's broken arm was a very recent injury. The baby's pediatrician testified that he examined the baby on July 9, four days before he was taken to the emergency room. At that time, the baby was congested and coughing. He thoroughly examined the baby and detected no bruises or broken bones. Although the triage nurse testified that four days later when she touched or moved the baby's arm, the baby cried, the teenager never testified that the baby cried when she was preparing to leave appellant's house or putting the baby in the car.

Even if we conclude that the jury disbelieved the baby's pediatrician, the evidence in this record establishes that some event likely occurred on July 13 that caused the teenager to seek medical treatment for the baby. If that event, however, was not the one described by the teenager, in which the baby was injured in the car, then the record clearly fails to establish a cause for the baby's bruises and broken arm. Simply put, except

for the teenager's testimony, the evidence does not otherwise prove the circumstances in which the broken arm and bruising occurred or who caused injury to the child.

> "[E]vidence is not sufficient to support a conviction if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture. The evidence must be such that it excludes every reasonable hypothesis of innocence. The giving by the accused of an unclear or unreasonable or false explanation of his conduct or account of his doings are matters for the jury to consider, but they do not shift from the Commonwealth the ultimate burden of proving by the facts or the circumstances, or both, that beyond all reasonable doubt the defendant committed the crime charged against him."

Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977) (citation omitted). As the Supreme Court held in Christian v. Commonwealth, 221 Va. 1078, 1083, 277 S.E.2d 205, 208 (1981), "[w]hile the defendant's opportunity to injure her [child] and certain other circumstances in this case may raise inferences which 'create a suspicion of guilt . . . or even a probability of guilt', we are of opinion the evidence is insufficient to exclude a reasonable hypothesis that someone other than the defendant was the criminal agent."

The Commonwealth's evidence concerning the other claims of abuse and neglect is similarly deficient. The teenager testified that when she was at the appellant's house preparing to leave, she noticed a small bruise on the baby's face. When the social worker and the police arrived at appellant's house on

- 26 -

the afternoon of July 13, and informed appellant and Dotson that the baby had been injured, Dotson informed them that the only injury she was aware of was a small bruise on the baby's cheek that occurred when her twenty-two-month-old child had hit the baby two days earlier with the baby's feeder. Even if the jury disbelieved that explanation for the bruise on the child's cheek, no evidence proved that it was caused by appellant's willful conduct.

When the baby was examined in the hospital, an x-ray showed that the baby had a healed fracture in a bone in his left leg. The doctor testified that the fracture was at least six weeks old and could have occurred anytime from the baby's premature birth until six weeks prior to the examination. He also testified that, because the seven-month-old baby was not bearing weight on his leg, the fracture might only have been manifested by the child being "irritable and fussy." Another doctor testified that "[c]hildren heal fractures very quickly" and that it would be guesswork to say when and how it occurred merely by viewing the x-ray. The baby's pediatrician testified that the baby had been his patient since December 1995 and that he had examined the baby six times during regular office visits. He testified that he never saw bruises on the child and never detected any broken bones; he found no reasons or indications during his treatments to order x-rays to look for broken bones. He testified that on July 9 when he examined the baby, the baby

"was essentially normal" and, except for a cold, the baby was healthy.

Dr. Keys testified that the growth chart he prepared showed that the baby, who was born prematurely, made "nice progress" until his fifth month.  No evidence tended to show that anyone other than the appellant and Dotson were caring for the baby during that period.  Dr. Keys testified that "from five months to what we saw in the seven and a-half months, [the baby] basically didn't grow; didn't gain any weight, so he flat-lined."  He considered the lack of growth during that two and a-half months "abnormal" and testified that "if [the baby] was fed in the right way, he would gain weight."  The doctor testified that he did not know the cause of the feeding problem and that "[i]t could have resulted from a lack of knowledge" by the parents.  In short, his testimony is consistent with proof of faulty nutrition.

The Commonwealth had the burden of proving each element of the offense beyond a reasonable doubt.  The Commonwealth on brief contends "[t]he jury reasonably could conclude, based on all the evidence, that [appellant] was guilty of violating Code § 18.2-371.1(A)."

> "Suspicion of guilt, however strong, or even
> a probability of guilt, is insufficient to
> support a conviction."  And, when the
> evidence is wholly circumstantial, as in
> this case, "all necessary circumstances
> proved must be consistent with guilt and
> inconsistent with innocence and exclude

> every reasonable hypothesis of innocence.
> The chain of necessary circumstances must be
> unbroken."

Rogers v. Commonwealth, 242 Va. 307, 317-18, 410 S.E.2d 621, 627

(1991) (citations omitted).

Even if the judge had properly instructed the jury

concerning the Commonwealth's obligation to prove willful

conduct, the record, when viewed in the light most favorable to

the Commonwealth, failed to establish sufficient evidence from

which the jury could have found beyond a reasonable doubt that

appellant engaged in willful acts, or willful omissions, or

willful refusals to provide any necessary care for the baby's

health.  The jury could not have found without speculation that

appellant acted willfully.  Accordingly, we reverse the

conviction and dismiss the indictment.

                                    Reversed and dismissed.